Otto R. Seda et al., María Isabel Negroni de Vélez et al., Tartak Brothers, Inc., demandantes, recurridos y la última también recurrente, *v.* Miranda Hnos. & Co., S. en C., demandada y recurrente.

*Números:* 12,642     *Resueltos:* 13 de mayo de 1963
           12,867
           AP-62-25

*L. E. Dubón, Luis E. Dubón, Jr., A. Torres Braschi* y *R. Ruiz Sánchez,* abogados de la recurrente; *Héctor González Blanes,* abogado de algunos de los recurridos y de Tartak Brothers, Inc.; *Héctor Ramos Mimoso* y *Benjamín Rodríguez Ramón,* abogados de algunos de los recurridos.

Sala integrada por el Juez Asociado el Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

PER CURIAM: Miranda Hnos. & Co., S. en C., opera una fábrica localizada en un edificio sito en la Avenida Ponce de León. La fábrica requiere el uso de una caldera. El humo y los gases provenientes del combustible usado en el funcionamiento de la caldera son expelidos por una chimenea. Al lado del edificio de Miranda Hnos. está localizado uno de mayor altura perteneciente a Tartak Brothers, Inc. Tartak tenía arrendados a la División de Bienestar Público del Departamento de Salud, los pisos sexto y séptimo del edificio.

El 11 de marzo de 1955 Tartak Brothers, Inc., instó una demanda contra Miranda Hnos. para recobrar los daños que le ocasionaron el humo, el hollín y los gases que expele la chimenea. Alegó haber sufrido daños por la cantidad de $60,000.00. Posteriormente, con fecha 22 de mayo, la demanda fue enmendada para reclamar la cantidad de $15,180.00 adicionales correspondientes a las rentas mensuales dejadas de recibir por haberse desalojado el sexto y séptimo piso por mor de los gases corrosivos y dañinos que expele la chimenea. Es pertinente consignar que Tartak con fecha 5 de octubre de 1954 había solicitado "un auto permanente de *injunction* prohibiendo a la demandada que continúe usando la chimenea que tiene colocada sobre el edificio de su propiedad situado en

la Avenida Ponce de León 1256, y cese de arrojar el humo, hollín y gases que por dicha chimenea arroja". La vista de este caso se celebró durante los días 15, 18 y 29 de noviembre de 1954. En 22 de octubre de 1958 confirmamos la sentencia dictada concediendo el *injunction*. *Tartak Brothers* v. *Miranda Hnos. & Co.*, 80 D.P.R. 781 (1958).

El 14 de marzo de 1955 un grupo de treinta y tres empleados de la División de Bienestar Público inició una acción reclamando los daños sufridos por haber aspirado y estado expuestos al humo, hollín y gases corrosivos y venenosos lanzados por la chimenea. Reclamaron $165,000 de daños.

El 1ro. de abril de 1955 otro grupo de catorce empleados de la referida División instó otra demanda. Alegaron que "los gases generados por la chimenea de la demandada contaminaron la atmósfera en forma tal que desde allá para noviembre de 1952 fecha en que las oficinas donde trabajaban los demandantes quedaron instaladas en el edificio [de la demandada], han causado y están causando a los demandantes daños y perjuicios consistentes en envenenamiento, decaimiento de la salud, irritación conjuntival y de las vías respiratorias, trastornos estomacales, naúseas, vómitos, diarreas y otros males productos de intoxicación por inhalación de gases". Este grupo reclamó $84,000.00.

Las tres demandas fueron consolidadas para verse conjuntamente en el tribunal de instancia. Se declaró con lugar la demanda instada por Tartak, concediéndosele $27,613.00 de indemnización más $3,000 de honorarios. Se desestimó una de las partidas de daños reclamadas, la referente a los daños sufridos por los muebles y mercancías. Las otras dos demandas fueron declaradas con lugar pero le fue negada compensación a cinco de los demandantes. Al primer grupo se le concedió una indemnización de $7,900 más $6,000 de honorarios de abogado. Al segundo grupo $11,600 más $3,000 de honorarios. La demandada recurrió ante nos de las sentencias dictadas en su contra. Tartak de aquella parte que le

negó derecho a reclamar una partida de daños. Consideraremos todos los recursos interpuestos en esta opinión.

La demandada apunta cuatro errores: (1) Sostiene que el tribunal de instancia incurrió en error al apreciar la prueba; (2) Alega que una de las partidas de daños concedidas a Tartak es improcedente, pues en el pleito de *injunction* anterior no los reclamó. Invoca nuestra opinión en *Cruz* v. *Ortiz*, 82 D.P.R. 834 (1961); (3) Mantiene, en relación con la reclamación de Tartak por rentas dejadas de percibir que la misma está prescrita y que de no estarlo, se concedió más que lo establecido por la prueba; (4) Por último, apunta que los honorarios de abogado concedidos son excesivos; (5) En el recurso interpuesto por Tartak se apunta que fue errónea la determinación del juez de instancia al negar compensación por los daños ocasionados a los muebles y mercancías existentes en la tienda.

■ 1. Consideremos el primer error apuntado. La prueba presentada indubitablemente establece que los empleados de Bienestar Público, demandantes en esta acción, sufrieron los daños que reclaman. Ahora bien, la demandada sostiene que habiéndose establecido científicamente, así como por un perito en toxicología, que para que el gas venenoso que expelía la chimenea, identificado como anhídrido sulfuroso o bióxido de azufre, cause los trastornos que alegaron padecer los reclamantes, tenía que existir una concentración en la atmósfera de más 10 p.p.m. (¹) y que como de las pruebas realizadas, la más alta arrojó una concentración de 5.4 p.p.m., era ineludible concluir que los daños sufridos no fueron ocasionados por los gases expelidos por la chimenea.

■ El juez de instancia al considerar este mismo planteamiento resolvió que "[p]or más respetables y dignos de crédito que nos parezcan los testimonios de los dignos doctores Machle, Colón, Ramírez Torres y otros peritos de la demandada,

---

(¹) P.P.M. equivale a "partes por millón".

los mismos no son suficientes para derrotar la realidad de los sufrimientos físicos y morales sufridos y padecidos por los demandantes. . .". Y es que, como en todas las cosas en esto de los trastornos orgánicos que puedan ocasionar la concentración de gases venenosos en la atmósfera no pueden establecerse medidas inflexibles, reglas constantes. En el volúmen 69, número 8 de agosto de 1954 del Public Health Reports, admitido en evidencia, aparece un interesante artículo escrito por la Dra. Mary O. Amdur. Refiere la experiencia en distintos sitios del mundo con la concentración del gas anhídrido sulfuroso o bióxido de azufre en la atmósfera. Del artículo citamos lo siguiente:

"Tenemos más información sobre efectos muy severos, gracias a estudios hechos sobre la tragedia del valle Meuse en 1930, que resultó en 60 muertes; la neblina de 1948 en Donora, Pa., que mató a 20 personas y causó síntomas agudos de variada intensidad al 40 por ciento de la población; y la neblina de diciembre de 1952 en Londres, que causó la muerte de un gran número de personas. Un hecho resulta claro. Las muertes y enfermedades ocurridas durante estos incidentes se debieron a impurezas químicas en la atmósfera y no a otras causas.

".        .        .        .        .        .        .        .

"Las medidas de la concentración de bióxido de azufre y humo hechas en Londres durante la neblina así como los cálculos hechos luego de los incidentes del valle Meuse y de Donora revelan que la concentración de impurezas no era excesivamente alta. Eran, claro está, más altas que las que normalmente se encuentran en la atmósfera, pero no caían en forma alguna dentro del nivel corrientemente considerado como letal o dañino. Las concentraciones ni siquiera se aproximaban a las llamadas concentraciones máximas permisibles—los niveles que los higienistas consideran seguros para los trabajadores industriales sujetos a una exposición de 8 horas diarias.

"La concentración máxima permisible para bióxido de azufre es de 10 p.p.m. La concentración en el valle Meuse fue calculada en 8 p.p.m. y la de Donora en 0.5 p.p.m. El promedio, por medida, de bióxido de azufre durante el día más crítico de la neblina en Londres resultó ser 1.3 p.p.m. Esta concentración es casi 10

veces la que normalmente existe en Londres, pero por el otro lado, es solo una décima parte de la concentración máxima permisible.

"¿Cómo puede ser que las impurezas atmosféricas produzcan tanta enfermedad y muerte en concentraciones normalmente consideradas no perjudiciales? A primera vista parece sorprendente que así sea. Para algunos resulta tentador concluir que ésta o aquella impureza no pudo concebiblemente haber contribuido a la situación en general ya que trabajadores industriales han estado sometidos a concentraciones aún mayores sin haber sufrido daño alguno durante cierto número de años.

"Pero, ¿son comparables el trabajador industrial y la persona que sufre daños durante la neblina? Por varias razones creo que la contestación es que no.

"Estas concentraciones máximas permisibles sirven a manera de guía en cuanto a los niveles de exposición para individuos cuya salud les permitiría trabajar en la fábrica en primer lugar. Las personas con historial cardíaco o respiratorio de alguna severidad no se encuentran, como regla general, en trabajos donde los irritantes respiratorios se encuentran comúnmente. Por lo tanto, los niveles de concentración máxima permisible están preparados para proteger al individuo promedio, no al altamente susceptible. Sin embargo, es con este tipo de individuo con quien debemos tratar cuando ocurren las neblinas."

Visto lo anterior, es claro pues, que no se cometió el error imputado.

■ 2. En *Cruz* v. *Ortiz*, supra, resolvimos que en una acción de *injunction* para impedir o prohibir la continuación de actos y actividades generadoras de daños, el demandante puede reclamar los daños que existían y se causaron con estos actos o actividades hasta el momento de la vista del recurso de *injunction*. De no reclamarlos entonces la regla de fraccionamiento de las causas de acción le impide reclamar en un pleito posterior tales daños.

La sentencia le concedió al demandante Tartak $10,360, costo de instalar ventanas nuevas por haberse deteriorado las existentes por la acción corrosiva de los gases que expelía la chimenea. La demandada alega que estos daños los pudo re-

cobrar la demandante en el pleito de *injunction* a que anteriormente hicimos alusión. La vista del referido pleito se llevó a cabo durante los días 15, 18 y 29 de noviembre de 1954. El testimonio del Sr. Pablo Tartak en el referido pleito demuestra que para esa fecha ya se conocía el costo del cambio de las ventanas y se había celebrado un contrato para llevarlo a cabo. Es evidente pues, que no procedía conceder en esta acción partida alguna por el cambio de las ventanas.

■ 3. La demandada, para sostener su punto de que la partida concedida por pérdida de rentas estaba prescrita, apunta que la demanda fue enmendada para establecer la reclamación luego de haber pasado un año de haber sido desocupados los dos pisos. En *Capella* v. *Carreras*, 57 D.P.R. 258 (1940), que ratificamos en *Arcelay* v. *Sánchez*, 77 D.P.R. 824 (1955), adoptamos la regla al efecto de que los daños y perjuicios causados por el continuado mantenimiento de un estorbo o perturbación, pueden recobrarse por todo el tiempo de la duración del estorbo.

El tribunal de instancia concedió por este concepto una partida de $17,253. Examinada la prueba presentada, la cantidad correcta a concederse es $14,148.41. Los pisos sexto y séptimo estuvieron desocupados entre abril 15, 1955, y mayo 22 de 1956, fecha en que se enmendó la demanda, o sea 13 meses y una semana. El canon mensual por el alquiler de ambos pisos era de $1,166. Lo que hace un total de $15,449.66. (²) De esta suma hay que deducir $105 mensuales durante los tres meses y una semana transcurridos entre el 14 de octubre de 1955 y el 23 de enero de 1956, período durante el cual estuvo alquilada una oficina montante en total a $341.25 y además $960 correspondientes al período entre el 23 de enero de 1956 y mayo de ese mismo año por un canon de $240 mensuales. Las dos cifras hacen un total de $1,301.25 que restados de $15,499.66, resultan ser $14,148.41.

---

(²) La demandada erróneamente expresa que el total es $13,217.

4. Pasemos a considerar la impugnación a los honorarios concedidos. Claramente resultan desproporcionados. Considerada la actitud de la demandada y el trabajo realizado, una condena de honorarios de $3,500 en el caso AP 62-25, de $2,000 en el caso civil 12867 y de $1,500 en el caso civil 12642 es razonable.

5. En relación con la apelación interpuesta por Tartak Brothers, Inc., sobre aquella parte de la sentencia que le niega derecho a recibir compensación por los daños a los muebles, el error alegado no fue cometido.

■ La posición de Tartak es que la demandada le responde de aquella cantidad que dejó de ganar (lucro cesante) por verse obligada a vender los muebles dañados a un precio inferior al que regularmente se vendían. Se ha reconocido el lucro cesante como daño compensable. *Cintrón* v. *Insular etc. y Balbaño*, 58 D.P.R. 821 (1941) ; *Avilés* v. *Hijos de Rafael Toro, S. en C., et al.*, 27 D.P.R. 671 (1919) ; *Muriente* v. *Terrasa et al.*, 22 D.P.R. 738 (1915). Pero para que éstos sean otorgados es necesario que se pruebe su cuantía con certeza y precisión. Ver: *Muriente* v. *Terrasa*, supra.

La prueba presentada por Tartak consistió en la declaración prestada por el Sr. Eduardo Tartak y en la contestación que éste prestó a un interrogatorio que le notificó la demandada. De dicha prueba se desprende que el Sr. Tartak "calculó" la "depreciación" sufrida por cada mueble y que restó esa cantidad por concepto de depreciación del precio al que se vendía el mueble normalmente.

Sin embargo, no ofreció prueba sobre el precio a que fueron vendidos los muebles dañados ya que éstos no fueron identificados. Aun en las escasas facturas presentadas el Sr. Tartak manifestó su imposibilidad de afirmar que los muebles allí descritos correspondían a los dañados. Tampoco se le presentó al tribunal prueba sobre el costo de dicho muebles.

La base utilizada por la apelante es ciertamente una muy imprecisa. De haber presentado prueba del precio a que ven-

dió cada mueble dañado así como del precio al que usualmente vendía dichos muebles cuando estaban en buenas condiciones, el tribunal hubiera estado en mejor posición para determinar los daños con precisión.

No se cometió el error.

*Procede por todo lo expuesto modificar la sentencia dictada por el Tribunal Superior, Sala de San Juan, con fecha 16 de enero de 1958 en el sentido de reducir la indemnización concedida a Tartak Brothers, Inc., a la suma de $14,148.41 y reducir la concesión de honorarios de abogado en la forma antes expresada. Así modificada la sentencia, será confirmada.*