JUAN ROSARIO CRESPO Y JULIO DE JESÚS MARTÍNEZ, demandantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrente.

*Número:* R-64-246 · *Resuelto:* 21 de junio de 1967

---

*José Antonio Arabía* y *Carlos M. Díaz Lamoutte,* abogados de la recurrente; *Enrique Leo Henríquez* y *Amancio Arias Cestero,* abogados de los recurridos.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Los recurridos Juan Rosario Crespo y Julio de Jesús Martínez radicaron demanda contra la Autoridad de las Fuentes Fluviales de Puerto Rico, reclamándole los daños y perjuicios sufridos por ellos al ocurrir un accidente el día 3 de febrero de 1961 en la Urbanización College Park. Alegaron que el accidente de referencia se debió a la negligencia exclusiva de la demandada quien a pesar de los múltiples requerimientos que se le hicieron al efecto y de haber recibido el pago de los gastos en que había de incurrir, no removió el tendido eléctrico de alta tensión, ni aumentó su altura del suelo, exponiendo con tal descuido y negligencia la vida y seguridad de las personas que allí trabajaban o visitaban el proyecto de urbanización "College Park".

Contestó la demandada negando los hechos esenciales y alegó, en contrario, entre otras defensas afirmativas, que el accidente fue causado por la negligencia exclusiva de los propios demandantes o a la negligencia exclusiva y/o combinada de terceras personas ajenas a la demandada.

Se celebró un juicio conjunto en los méritos y luego de formular conclusiones de hecho y de derecho, el tribunal de instancia resolvió que el accidente se debió a la negligencia de los propios demandantes y dictó sentencia declarando sin lugar las demandas.

Los demandantes solicitaron la reconsideración de esa sentencia y el tribunal, luego de formular nuevas conclusiones y a la luz de la doctrina establecida en el caso de *Vda. de*

*Dávila* v. *A.F.F.*, 90 D.P.R. 321 (1964), resolvió que los demandantes no fueron negligentes y que el accidente se debió a la negligencia exclusiva de la demandada. Reconsideró su sentencia y dictó otra ordenando a la demandada a pagarles la suma de $40,000 al demandante Juan Rosario Crespo y $25,000 al codemandante Julio de Jesús Martínez, más la suma de $6,500 para honorarios de abogado, fundándose en las siguientes Conclusiones:

"1.—El accidente que originó este pleito ocurrió en el Bloque 'E' de la Urbanización College Park de Río Piedras el día 3 de febrero de 1961.

2.—Para esa fecha (y en la actualidad) la manzana 'E' de dicha Urbanización la cruzaba unas líneas de energía eléctrica de 38,000 voltios, propiedad de la demandada Autoridad de las Fuentes Fluviales.

3.—Los demandantes para la fecha del accidente eran empleados de la Interstate General Contractors. Esta entidad realizaba los trabajos de urbanización de los terrenos donde ocurrió el accidente. A la fecha de éste, ya la primera sección de la Urbanización había sido terminada y se estaban realizando trabajos en la segunda sección en la cual radica la manzana 'E'. En esta manzana a la fecha del accidente ya habían sido construidas las estructuras de las casas.

4.—Los planos de la Urbanización College Park fueron sometidos a la Autoridad de las Fuentes Fluviales oportunamente y éstos fueron aprobados en abril 6 de 1960 sujetos a la convalidación de la servidumbre para las líneas de transmisión existentes.

Desde la fecha en que le fueron sometidos los planos de la Urbanización la Autoridad de las Fuentes Fluviales tenía conocimiento de la altura a que quedarían las líneas luego de realizado el movimiento de tierra en la Urbanización.

5.—En 29 de junio de 1960 la Interstate General Contractors, previo presupuesto que le fue sometido por la Autoridad de las Fuentes Fluviales, pagó a ésta la cantidad de $1,884.00 para la instalación de dos estructuras tipo H en las líneas antes mencionadas.

6.—En diciembre de 1960 la Interstate General Contractors, también previo · presupuesto sometido por la Autoridad de. las Fuentes Fluviales, pagó a ésta la suma de $3,677.00 para. aumentar la altura de dichas líneas.

7.—La Autoridad de las Fuentes Fluviales no realizó el trabajo hasta luego de ocurrido el accidente.

8.—Con anterioridad al accidente varios empleados y funcionarios de la Autoridad de las Fuentes Fluviales, entre otros los Ingenieros Manuel Gatell y Juan Borrero, visitaron la Urbanización College Park en diversas ocasiones, con el propósito de hacer el presupuesto y para llevar el material necesario para levantar las líneas.

9.—El Ingeniero Manuel Gatell visitó la Urbanización por primera vez en agosto de 1960 y conocía la altura a que estaban las líneas.

10.—Los demandantes formaban parte de una brigada que estaba rectificando la cabida y colindancias de los solares y según convenio con empleados de la Autoridad de las Fuentes Fluviales que días antes habían comenzado a almacenar el material para el trabajo de levantar las líneas, estaban localizando los puntos donde se instalarían los nuevos postes.

11.—Este trabajo de localizar los puntos donde habrían de instalarse los postes tomaba alrededor de media hora. Para ello el demandante Juan Rosario Crespo estaba utilizando una mira de las que corrientemente se usan en trabajos de ingeniería.

12.—Este. instrumento se compone de dos piezas de madera. Una de las cuales está embutida en la otra. Por su frente y espalda la mira tiene una faja de mental numerada. La mira cerrada mide siete pies de largo y extendida mide trece pies seis .pulgadas.

13.—Los números de la faja de metal tienen el propósito de tomar medidas en el terreno.

14.—Mientras Juan Rosario Crespo sostenía la mira en posición vertical, Julio de Jesús Martínez tenía que apuntar en los números que hay en la faja de metal de la mira con un clavo de acuerdo con las instrucciones que le daba otro empleado que

tenía la misión de tomar las medidas con un tránsito. Mientras se realizaba esta labor, Rosario Crespo tenía que subir y bajar la mira cuyo extremo inferior cuando estaba en reposo, o sea, sin subir o bajar, se encontraba de dos a tres pies más o menos de la tierra. El movimiento de la mira hacia arriba o abajo fluctuaba entre uno a dos pies.

15.—En uno de estos movimientos hacia arriba, Rosario Crespo recibió una fuerte descarga de la línea de 38,000 voltios.

16.—Parte de la descarga se transmitió a de Jesús Martínez que estaba en cuclillas a través del clavo con que apuntaba en los números de la mira.

17.—De acuerdo con lo dispuesto por el 'National Electric Safety Code', la altura mínima a que deben estar los conductores de energía eléctrica de 38,000 voltios en la zona rural es de diez y siete (17) pies. En otras zonas la altura mínima para el mismo voltaje debe ser de veintidós (22) pies. En el sitio donde ocurrió el accidente las líneas estaban a una altura de no mayor de diez y ocho (18) pies.

18.—El sector donde ocurrió el accidente, aunque a la fecha de la instalación de las líneas originales, las cuales fueron instaladas hace más de 25 años, era una zona rural, había dejado de serlo por haberse construido varias urbanizaciones en dicho sector, entre otras, Santa María, la primera sección de College Park y las estructuras de la segunda sección.

19.—Como consecuencia del accidente Juan Rosario Crespo sufrió quemaduras de tercer grado cubriendo el 33⅓% del área de su cuerpo. Tuvo que someterse a sendas intervenciones quirúrgicas para amputarle los dedos cuarto y quinto de ambos pies. Además se le sometió a varias operaciones para hacerle injertos de piel, todo lo cual le ha dejado notorias cicatrices, entre otras, una de ocho pulgadas de largo por tres de ancho en el muslo izquierdo, otra de tres y un cuarto pulgadas de largo por una pulgada de ancho en el abdomen, otra de seis pulgadas de ancho que se extiende desde el codo hasta la muñeca del brazo derecho, otras en la mano derecha e izquierda incluyendo el cuarto y quinto dedo, otra de once pulgadas de largo por ocho pulgadas de ancho en el muslo derecho. En la pierna izquierda tiene una cicatriz que se extiende desde la parte baja de dicha pierna por el tobillo hasta el pie. El tobillo de la pierna

izquierda ha quedado completamente anquiloso. Para poder caminar este demandante usa soportes de metal y zapatos ortopédicos los cuales tendrá que usar por el resto de su vida. Estuvo recluido en el hospital desde el 3 de febrero de 1961 hasta el 19 de julio de 1961, continuando bajo tratamiento ambulatorio desde el 19 de julio de 1961 hasta el 2 de abril de 1962. Juan Rosario Crespo ganaba $44.00 semanales y no ha podido trabajar desde la ocurrencia del accidente ya que quedó con una incapacidad de un 40% de sus funciones fisiológicas generales que le impiden realizar sus labores habituales.

20.—Julio de Jesús Martínez sufrió graves quemaduras que cubren un 33⅓% del área total de su cuerpo, que le han dejado numerosas cicatrices, entre otras una profunda que mide alrededor de cinco pulgadas de largo por cinco de ancho de forma circular en la parte izquierda del pecho y otra en el mismo lado de siete pulgadas de largo por siete pulgadas de ancho. En la mano derecha tiene cicatrices de quemaduras en la muñeca y en la mano por ambos lados y en los dedos medio, así como en los dedos cuarto y quinto. En el brazo izquierdo, tiene una cicatriz que se extiende desde cerca del codo hasta la muñeca. Tiene otras cicatrices en la parte superior del brazo izquierdo que se extienden desde el codo hasta el hombro. El hombro con motivo de las quemaduras ha quedado limitado en su movimiento. En la mano izquierda tiene cicatrices de quemaduras que se extienden desde la muñeca hasta el dorso del dedo quinto izquierdo, el cual también ha quedado limitado en su movimiento. En el muslo presenta una cicatriz de siete pulgadas de largo por ocho pulgadas de ancho. Asimismo tiene cicatrices de quemaduras en la planta del pie izquierdo. Tiene otras cicatrices de quemaduras en el tobillo derecho y en el dedo del pie derecho. Tuvo que ser sometido a intervenciones quirúrgicas y estuvo hospitalizado desde febrero 3 de 1961 hasta abril 14 de 1961 y recibió tratamiento ambulatorio hasta el 13 de junio del mismo año. Fue dado de alta finalmente en julio 6 de 1961. Durante todo el tiempo que estuvo hospitalizado y bajo tratamiento, dejó de asistir a su trabajo donde recibía una remuneración de $39.00 semanales. En total dejó de percibir ingresos ascendentes a la suma de $858.00. Ha quedado con una incapacidad de 25% de sus funciones fisiológicas generales.

21.—Las lesiones sufridas por ambos demandantes son sumamente dolorosas." (Caso Civil Núm. 62-8607, págs. 84 a 89.)

Expedimos un auto para revisar la referida sentencia.

La recurrente señala la comisión de ocho errores.

Discutiremos en primer lugar el séptimo error en el cual se sostiene que la reclamación del codemandante Julio de Jesús Martínez está prescrita y que el tribunal de instancia incidió al no desestimarla según se le solicitó.

El accidente que dio origen a la causa de acción de dicho codemandante ocurrió el día 3 de febrero de 1961. La demanda se radicó en el Tribunal Superior, Sala de San Juan, el día 2 de diciembre de 1962. En la demanda se alegó y se probó en el juicio que el referido codemandante Julio de Jesús Martínez había hecho a la demandada, dentro del término prescriptivo de un año, una reclamación extrajudicial mediante carta certificada con acuse de recibo.

La teoría de la demandada recurrente es que si bien el Art. 1873 del Código Civil [31 L.P.R.A. sec. 5303] dispone que la prescripción de las acciones se interrumpe por su ejercicio ante los tribunales, *por reclamación extrajudicial del acreedor* y por cualquier acto de reconocimiento de la deuda por el deudor, el codemandante no es un acreedor de la demandada porque la prestación exigídale no es líquida y que siempre que el término prescriptivo ha quedado interrumpido mediante la mera reclamación extrajudicial por parte del acreedor, la acción ha sido basada en una relación obligacional o nexo previamente existente entre las partes.

No tiene razón la demandada-recurrente.

En el caso de *Cruz* v. *González*, 66 D.P.R. 212 (1946), se desestimó la demanda incoada contra la asegurada y la compañía aseguradora porque la causa de acción había prescrito. Se alegó por la demandante la interrupción de la prescripción mediante reclamación extrajudicial hecha dentro del término de prescripción a la compañía aseguradora. Dijo este Tribunal en dicho caso:

"Sostiene la apelante que la corte inferior erró al estimar prescrita la acción. Arguye en primer término que, si bien la demanda se radicó más de un año después de ocurrir el accidente, se alega en la misma una reclamación extrajudicial que interrumpió el término prescriptivo. La reclamación extrajudicial se hizo a una sola de las partes demandadas, a saber, la compañía aseguradora de los daños que causara el camión perteneciente a otra demandada.

La corte inferior resolvió que la reclamación hecha a la aseguradora no interrumpió el .período prescriptivo, por no ser la aseguradora deudora de la demandante, ni ésta acreedora de aquélla. La apelante insiste en que es acreedora de la aseguradora, particularmente en vista del artículo 175 de la Ley de Seguros de Puerto Rico, que le permite demandar a la aseguradora conjuntamente con el asegurado. Pero suponiendo sin resolverlo, que la apelante sea acreedora de la aseguradora, y que por lo tanto su reclamación extrajudicial interrumpiera el término prescriptivo de suerte que no resulte prescrita la acción en cuanto a la aseguradora, tenemos que la acción está prescrita en cuanto al asegurado, y que por lo tanto la demanda no aduce hechos ni contra el asegurado ni contra la aseguradora, ya que ésta sólo responde si aquél es responsable." (Págs. 213, 214.)

En *Suárez* v. *Pereira*, 66 D.P.R. 236, (1946), distinguiéndole del de *Cruz* v. *González*, supra, se resolvió que la prescripción de la acción había sido interrumpida porque tanto el asegurado como la aseguradora, actuando ésta como agente de aquél, habían reconocido su responsabilidad en virtud de reclamaciones extrajudiciales antes de que transcurriera el término de prescripción.

En *Bithorn* v. *Santana*, 68 D.P.R. 300 (1948), la demanda en reclamación de daños se radicó después de haber transcurrido más de un año desde la fecha del accidente. Se sostuvo que la acción había prescrito. A la página 305, se dijo:

"La única otra base que podría favorecer al demandante es que había hecho una reclamación extrajudicial contra el acreedor, que interrumpió el término prescriptivo. Suponemos,

sin decidirlo, que el demandante en un pleito de daños es un acreedor de la aseguradora y que una reclamación extrajudicial hecha por el demandante a ésta interrumpiría el término prescriptivo en cuanto a un pleito contra ella. Pero la responsabilidad de la aseguradora depende de la responsabilidad del asegurado. De ahí que, si no se hace reclamación extrajudicial al asegurado y la reclamación contra éste prescribe, no puede existir causa de acción ni contra el asegurado ni contra la aseguradora, a pesar del hecho de que teóricamente la reclamación contra la aseguradora todavía está en pie porque la reclamación extrajudicial héchale solamente a ella interrumpió la prescripción en cuanto a ella se refiere. Esto es así porque, como hemos vistos, la responsabilidad de la aseguradora está predicada en la responsabilidad del asegurado. Una vez que la reclamación contra éste prescribe, el asunto está terminado. *Cruz* v. *González et al.,* 66 D.P.R. 212, 214.

En su consecuencia tenemos que determinar si se hizo una reclamación extrajudicial al asegurado. La demanda alega tal reclamación como hecha solamente el día después del accidente. Excepción hecha de la manifestación del demandante de que había informado a la aseguradora de la protesta del asegurado, porque aquélla no había hecho investigación alguna, según lo solicitó el demandante, las otras alegaciones de la demanda sobre este punto se limitan a requerimientos hechos por el demandante a la aseguradora en ciertas fechas no especificadas. Nada se desprende de estas alegaciones que equivalga a una reclamación extrajudicial directamente al asegurado dentro de un año antes de la radicación de la demanda enmendada."

■ La cuestión que el Tribunal dejó de decidir en dichos casos era la de si el demandante en un pleito de daños era un acreedor de la aseguradora. Bajo la legislación vigente entonces la responsabilidad de la aseguradora era subsidiaria a/y dependía de la responsabilidad del asegurado. Antes de 1952, fecha en que se enmendó al Art. 175 de la Ley de Seguros de 1921, una demanda contra la aseguradora solamente cuando no se había obtenido antes una sentencia firme contra el asegurado, no aducía una causa de acción. La ley ha cambiado. Véase Código de Seguros, 26 L.P.R.A. secs. 2001

y siguientes. No se discutía en dichos casos si el demandante era un acreedor del asegurado causante de los daños. Sin embargo, esas decisiones, especialmente en el caso de *Bithorn*, supra, descansaron en que la prescripción no fue interrumpida porque no se hizo reclamación extrajudicial al asegurado. Se dijo en el caso de *Bithorn* que para resolver la cuestión de prescripción había que determinar si se había hecha una reclamación extrajudicial al asegurado, concluyéndose que no se había hecho. De suerte que este Tribunal no tuvo dudas entonces, ni la tenemos ahora, de que en las obligaciones derivadas de la culpa o negligencia, el que sufre los daños es un acreedor del causante de los mismos, quien es su deudor y está obligado a repararlos. En su consecuencia una reclamación extrajudicial hecha al causante del daño, dentro del año de ocurrido el accidente, como se hizo en este caso, interrumpe el período de prescripción.

. Discutiremos ahora conjuntamente los errores primero y cuarto que se apuntan como sigue:

### Primer Error

"Erró el Honorable Tribunal Sentenciador al variar y sustituir algunas de sus Conclusiones de Hechos de su Sentencia de 25 de junio de 1964, por otras contradictorias de su Sentencia de 13 de noviembre de 1964; y en igual forma hacer otras Determinaciones de Hechos distintas y contradictorias a las de la Sentencia de 25 de junio de 1964, en ausencia de prueba para ello."

### Cuarto Error

"Erró el Honorable Tribunal al reconsiderar su Sentencia de 25 de junio de 1964."

Discutiendo el primer error la recurrente señala varias conclusiones de hecho formuladas en reconsideración que a su juicio, además de estar en conflicto con las conclusiones originales, no están sostenidas por la prueba. De ello nos ocuparemos más adelante.

Argumentando el cuarto error sostiene la recurrente que mediante reconsideración el tribunal sentenciador no está facultado para alterar o modificar los hechos jurídicos del caso sin que se ofrezca prueba adicional cuando dichos hechos están sostenidos por la prueba ya apreciada, o a menos que las conclusiones de hecho sean claramente erróneas o no representen el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida.

Igual criterio sostiene en cuanto a la moción bajo la Regla 43.2 de Procedimiento Civil para que el Tribunal determine hechos adicionales. "Su propósito,"—arguye—"es enmendar conclusiones de hechos previamente concluídas a fin de *adicionar* otros hechos de los cuales el Tribunal no hizo conclusión alguna. El propósito de esta disposición procesal no es volver a apreciar la prueba en sus méritos y hacer distintas conclusiones de hechos contradictorias entre sí."

No tiene razón.

Por disposición de la Regla 43.1 de Procedimiento Civil, en todos los pleitos el tribunal especificará los hechos probados y separadamente consignará sus conclusiones de derecho y ordenará que se registre la sentencia que corresponda.

Sin embargo, el tribunal está facultado para enmendar o hacer determinaciones adicionales. Al efecto, dispone la Regla 43.2 lo siguiente:

"No será necesario solicitar que se consignen determinaciones de hechos a los efectos de una apelación, pero a moción de parte, presentada a más tardar 10 días después de haberse archivado en autos copia de la notificación de la sentencia, el tribunal podrá enmendar o hacer determinaciones adicionales, y podrá enmendar la sentencia de conformidad. La moción se podrá acumular con una moción de reconsideración o de nuevo juicio de acuerdo con las Reglas 47 y 48 respectivamente. En todo caso, la suficiencia de la prueba para sostener las determinaciones podrá ser suscitada posteriormente aunque la parte que formule la cuestión no las haya objetado en el tribunal in-

ferior, o no haya presentado moción para enmendarlas, o no haya solicitado sentencia." (Reglas Proc. Civil, pág. 92.)

Existe una íntima relación, en lo que respecta a la facultad del tribunal para enmendar o variar tanto sus conclusiones como la sentencia, entre esta Regla 43.2 y la Regla 47, que faculta al tribunal para reconsiderar sus resoluciones y sentencias, y la 48.1 que le faculta para conceder un nuevo juicio, entre otros motivos, "(c) Cuando la justicia sustancial lo requiriere."

■ Ante tan amplia facultad no podría adoptarse un criterio restrictivo al efecto de que un tribunal no pueda variar sus conclusiones de hecho si considera que se equivocó al apreciar la prueba. Lo determinante en ese caso sería si las nuevas conclusiones y por ende, la sentencia dictada en reconsideración, están sostenidas por la evidencia admitida, y las conclusiones de hecho no son claramente erróneas. Véase, 5 Moore's *Federal Practice*, Sec. 52.11 (2), pág. 2685.

Pasamos ahora a considerar las nuevas conclusiones de hecho formuladas en reconsideración que a juicio de la recurrente no están sostenidas por la prueba, y cuál sería su efecto en cuanto a la responsabilidad de la demandada-recurrente.

Se impugnan en primer término las conclusiones de hecho números 6 y 7 al efecto de que la Interstate General Contractors pagó a la Autoridad de las Fuentes Fluviales para aumentar la altura de las líneas eléctricas y que la demandada no realizó los trabajos hasta luego de ocurrir el accidente. En verdad la prueba revela que la Interstate General Contractors pagó a la demandada tanto para reubicar como para levantar la altura de las líneas eléctricas y que los trabajos fueron paralizados antes de ocurrir el accidente, según la propia prueba de los demandantes, por los desarrolladores del proyecto, específicamente por el señor Townsend. Sin embargo y como expondremos más adelante, esos hechos no son decisivos

en cuanto a la responsabilidad que pueda tener la recurrente en la ocurrencia del accidente.

Se ataca también la nueva conclusión de hecho aumentando el por ciento de incapacidad sufrida por los demandantes pero esta nueva conclusión está ampliamente sostenida por la prueba.

Otros hechos nuevamente concluidos fueron (1) que la Autoridad de las Fuentes Fluviales tenía conocimiento de la altura a que quedaron las líneas luego de realizado el movimiento de tierra, (2) que el trabajo de relocalizar los puntos donde había de instalarse los postes tomaba media hora, (3) que la demandante no tomó providencias necesarias para evitar el accidente, como podría ser la suspensión del servicio de electricidad que fluía por las líneas de 38,000 voltios durante media hora en lo que se realizaban los trabajos de marcar los puntos donde debían instalarse los postes.

Respecto a como afecta la responsabilidad de la demandada la conclusión de estos nuevos hechos, habremos de discutirlo más adelante. Por ahora baste consignar que independientemente de que la Autoridad de las Fuentes Fluviales tuviera conocimiento de la altura a que quedarían las líneas luego de realizado el movimiento de tierra, sí tenía conocimiento de acuerdo con su propia prueba, de que la altura a que estaban las líneas sobre el Bloque E en el sitio del accidente era de 18 pies. Ni el tiempo que tomara el trabajo de fijar los puntos donde habían de instalarse los postes, ni la suspensión del servicio de electricidad durante ese tiempo, son factores únicos para fijar la responsabilidad de la demandada en este caso.

Los errores segundo, tercero, quinto y sexto, los discutiremos también conjuntamente. Fueron enunciados así:

### Segundo Error

"Erró el Honorable Tribunal al determinar que la demandada fue negligente y aplicar la doctrina jurisprudencial de

*Colón Vda. de Dávila* v. *Autoridad de las Fuentes Fluviales,* res. en 7 de mayo de 1964, y al no aplicar la doctrina de derecho correspondiente a los hechos probados."

### Tercer Error

"Erró el Honarable Tribunal al no concluir como cuestión de derecho, como lo había concluido previamente en su Sentencia de 25 de junio de 1964, que los demandantes fueron negligentes."

### Quinto Error

"Erró el Honorable Tribunal al concederle a los demandantes unas compensaciones exageradas."

### Sexto Error

"Erró el Honorable Tribunal al condenar a la demandada al pago de honorarios de abogados."

La recurrente trata de distinguir los hechos del caso de *Vda. de Dávila* v. *A.F.F.,* supra, de los del presente y en verdad difieren en muchos aspectos pero esa diferencia no es suficiente para exonerarla de toda responsabilidad.

■ Son hechos incontrovertibles que el día del accidente los obreros demandantes se encontraban en unión a otros obreros realizando labores en un área del Bloque E de la Urbanización, bien dándole nivel a un talud, según declararon algunos testigos de los recurrentes o bien localizando los puntos donde se instalarían los nuevos postes para la reubicación de las líneas eléctricas, según concluyó el tribunal sentenciador. En el sitio donde ocurrió el accidente las líneas estaban a una altura no mayor de 18 pies. Antes del movimiento de tierra en el desarrollo de la urbanización la altura de las líneas en ese sitio era mayor de 18 pies y no ofrecían peligro alguno; pero en el trabajo que realizaban los obreros demandantes con la mira había el riesgo de que dicho instrumento viniera en contacto o se aproximara tanto a los alambres de la línea eléctrica, que se produjera un accidente como

el que sufrieron los demandantes. Éstos, sin embargo, no tomaron precauciones para evitar el accidente, estando como estaban los alambres eléctricos a su vista. Por otra parte los urbanizadores permitieron que los obreros realizaran su labor en el sitio donde podía ocurrir el accidente, sabiéndolo porque era un hecho conocido por ellos, que en aquel sitio la altura de las líneas eléctricas no era mayor de 18 pies. Hubo pues negligencia tanto de los demandantes como de su patrono la Interestate General Contractors. Por ser un patrono asegurado éstos no responden de los daños y perjuicios causados a sus empleados por su negligencia. *Cortijo Walker* v. *A.F.F.*, 91 D.P.R. 574 (1964). Ésa sin embargo, no fue la única negligencia productora del daño sufrido por los demandantes.

La demandada tenía conocimiento de acuerdo con su propia prueba, de la altura a que quedarían las líneas de transmisión de corriente eléctrica una vez realizado el movimiento de terreno y así mismo tenía conocimiento de que en el sector del Bloque E por donde pasaban las líneas se realizaban trabajos por los urbanizadores al extremo de que ya, para la fecha del accidente, había casas construidas en ese sector. A pesar de ello, la demandada no tomó medida alguna para evitar los accidentes previsibles que pudieran ocasionar las líneas eléctricas por razón de su altura. Su responsabilidad, sin embargo, se limita a la proporción en que su negligencia contribuyó a la causa del daño sufrido por los demandantes. *Vda. de Andino* v. *A.F.F.*, 93 D.P.R. 170 (1966).

La proporción en que la negligencia de la demandada contribuyó al daño es mínima, comparada con la negligencia de los urbanizadores y la de los propios demandantes, no debiendo exceder la misma de un veinte por ciento. Compárese con *Vda. de Dávila* v. *A.F.F.*, supra.

Tampoco incurrió en error el tribunal sentenciador al imponer a la demandada el pago de una suma para honorarios

de abogado. Sin embargo, la suma concedida de $6,500.00 es excesiva y debe ser reducida a $3,000.00.

█ El octavo y último señalamiento de error carece de méritos. La prueba demuestra que los demandantes no eran empleados de la demandada ni trabajaban en el momento de ocurrir el accidente para ella ni bajo su dirección. Los demandantes eran obreros asegurados por su patrono la Interstate General Contractors y como tales fueron compensados por el Fondo del Seguro del Estado. La demandada, no era, frente a los demandantes, un patrono asegurado y por ende, cubierta por la inmunidad que concede la Ley de Compensaciones por Accidentes a los patronos asegurados.

*Por los fundamentos expuestos, se modificará la sentencia dictada por el Tribunal Superior, en los términos expuestos en esta opinión, y así modificada, será confirmada.*