ÀNDRÉS MASA TORRES, ETC., ET AL., demandantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrente.

*Número:* R-66-403          *Resuelto:* 12 de febrero de 1969

*José Antonio Arabía* y *Luis A. Lugo, Jr.*, abogados de la recurrente; *Castro & Castro*, abogados de los recurridos.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Recurre ante nos la Autoridad de las Fuentes Fluviales de Puerto Rico de la sentencia del Tribunal Superior, Sala de San Juan, que la condenó a pagar a Israel Masa González la suma de $57,220, a sus padres la suma de $5,000 por los sufrimientos mentales sufridos por ellos y $6,000 por concepto de honorarios de abogado con motivo de las serias lesiones que sufriera al venir en contacto con la corriente primaria en un transformador en el cual trabajaba.

Los apuntamientos de la recurrente van dirigidos, en conjunto, a impugnar la apreciación de la prueba realizada por el tribunal de instancia y, en particular, a señalar su error al no concluir que el recurrido y su patrono causaron el accidente en cuestión.

En este caso resulta evidente de nuestro examen del récord que la negligencia de ambos litigantes, aunque en distinto grado, causó el accidente que ha motivado este litigio. Por lo tanto, debe modificarse la sentencia y reducirse la cuantía de los daños impuesta a la recurrente.

El tribunal de instancia concluyó que:

1.—Con motivo de no recibir corriente eléctrica una casa en la Cuarta Sección de la Urb. Villa del Rey, el Sr. Canetti, empleado de la recurrente a cargo de la inspección de sistemas soterrados, fue a determinar la causa de esa falla el día 1ro. de diciembre de 1964. Con anterioridad a esa fecha, la firma de Carrero & Tristani había terminado la instalación eléctrica de dicha sección, incluyendo el transformador T-18 y la misma había sido inspeccionada y aprobada por la referida Autoridad y ésta tenía dicho transformador bajo su dominio

el cual cerraba con un candado cuyas llaves guardaba la Autoridad.

El recurrido Israel Masa González era empleado de Carrero & Tristani desde hacía siete meses. Comenzó como obrero haciendo zanjas y colocando cables en ellas y luego como ayudante de electricista en líneas muertas. Trabajaba en pedestales y transformadores sin corriente.

Al notar Canetti que en el transformador T-18 no estaban conectados ciertos cables que habían sido repuestos por Carrero & Tristani con motivo de una anterior avería, fue a ver al Sr. Collazo, capataz de Carrero & Tristani, pero aquél no estaba y habló con el Sr. Díaz, empleado de Carrero & Tristani y éste le dijo que enviaría un hombre para el trabajo. El hombre enviado fue el demandante. Canetti lo llevó en un vehículo de la Autoridad hasta el transformador T-18 para que hiciese el trabajo. Al llegar al sitio donde estaba el transformador Canetti usó una llave y abrió el candado del gabinete y las dos puertas. Sacó un plano y le explicó a Israel lo que había que hacer, o sea, conectar unos cables en el lado derecho del transformador, cuyo lado tenía solamente 13 pulgadas de ancho.

El tribunal de instancia concluyó que:

"Canetty [sic] quitó algunos de los 'machetes' de la sección izquierda del transformador que tenía alto voltaje, lo cual dejó sin corriente la sección derecha del transformador donde iba a trabajar el demandante. Canetty [sic] dejó puesto, sin embargo, uno de los machetes de la sección izquierda, quedando una tercera parte de esa sección con corriente de alto voltaje.

Canetty [sic] dejó ambas puertas abiertas y Masa se puso en cuclillas y comenzó a trabajar. El trabajo consistía en introducir unos cables por un pequeño hueco y a los pocos minutos, mientras Masa, en esa posición trataba de introducir los cables, tocó con su rodilla izquierda el 'machete' situado en el lado izquierdo del transformador, el cual tenía corriente de alto voltaje . . . . Ocurrió una explosión y Masa cayó hacia atrás inconsciente, habiendo sufrido graves quemaduras. El Sr. Ca-

netty [*sic*] se encontraba a pocos pies de Masa mientras todo esto ocurría.

El accidente ocurrido pudo haberse evitado si los empleados de la Autoridad hubiesen dejado el transformador T-18 totalmente sin corriente antes de poner a Masa a trabajar en él, lo cual se pudo haber hecho fácilmente y en pocos minutos. También se pudo haber evitado el accidente manteniendo cerrada la puerta izquierda del gabinete donde estaba la sección de alto voltaje o usando el equipo protector correspondiente.

La Autoridad fue negligente al hacer la inspección original de las líneas y el transformador T-18, y no descubrir los defectos que existían en dicho transformador. También fue negligente el señor Canetty [*sic*] al ocupar una persona que no formaba parte del personal de la Autoridad para llevar a cabo la reparación en cuestión dentro del transformador, en violación de las normas de la Autoridad, especialmente sin cerciorarse primero de que estaba, por lo menos, ocupando un electricista con licencia o con la capacidad necesaria para la labor que se contemplaba.

Pero el señor Canetty [*sic*], fue aún más negligente, al indicar al joven Masa que no había corriente en ningún sitio del gabinete.

El señor Canetty [*sic*] en su declaración trató de explicar que él quiso decir que no había corriente en el lado derecho (donde había que trabajar), y que le dijo a Masa que al lado izquierdo había corriente. Pero aunque eso fuese cierto, tratándose de un gabinete que solamente tenía 36 pulgadas de ancho, la proximidad del peligro era tal que el señor Canetty [*sic*] no ha debido haber permitido que se hiciera el trabajo sin desconectar totalmente la corriente del transformador.

Como consecuencia del accidente el demandante Israel Masa quedó inconsciente por varias horas, y para salvarle la vida se le dio respiración artificial de boca a boca. Sufrió horribles quemaduras y estuvo hospitalizado durante 5 meses y 18 días en el Hospital Industrial.

Las quemaduras eran tan severas que el paciente estuvo en estado de gravedad durante dos o tres meses, y fué necesario

tenerle enfermeras especiales las 24 horas del día durante más de cinco meses—(hasta el día 11 de mayo de 1965)—habiéndose considerado indispensables dichas enfermeras desde el punto de vista médico. Fue necesario hacerle transfusiones y darle plasma en repetidas ocasiones.

Masa fue sometido a un total de cinco operaciones para hacerle injertos de piel ('grafting') y se le removió piel de un 20% de su cuerpo para los injertos, mediante el uso del 'dermatome'—una cuchilla que vibra parecida a la que usan los barberos para cortar el pelo—y que deja el área en carne viva. El tratamiento fue sumamente doloroso, ya que también había que hacerle limpiezas en las quemaduras para los injertos; y el paciente estaba siempre muy incómodo, pues no podía ni virarse en la cama.

.    .    .    .    .    .    .    .

El Tribunal examinó al demandante Israel Masa y á la fecha del juicio presenta horribles cicatrices por todo el cuerpo, siendo las peores en la rodilla izquierda, en el hombro y brazo derechos y en las piernas. Las fotografías del demandante admitidas en evidencia, tomadas pocos días antes del juicio, representan fielmente el aspecto actual de las cicatrices.

Como resultado del accidente el demandante Masa tiene la pierna izquierda anquilosada, con una limitación de flexión de 30 grados de un posible 135 grados, y tiene alguna debilidad en el brazo derecho. Camina con la rodilla extendida y con una evidente cojera. En la pierna izquierda los tejidos blandos están atrofiados, especialmente sobre la rodilla. Tiene atrofia en la piel del muslo derecho, pero no hay limitación de flexión.

Aparte de lo mencionado, Masa ha recuperado su peso y en la actualidad está en aparente buen estado de salud.

Después que fue dado de alta del hospital, Masa continuó en tratamiento ambulatorio y fue dado de alta definitivamente el 16 de febrero de 1966, habiéndosele reconocido por el Fondo del Seguro del Estado una incapacidad equivalente a la pérdida de un 50% de las funciones fisiológicas generales.

.    .    .    .    .    .    .    .

(a) El valor razonable de la hospitalización de Israel Masa a razón de $27.00 diarios durante el período en que estuvo

hospitalizado, incluyendo medicinas, plasma, sangre, sala de operaciones, anestesia, etc., pero sin incluir enfermeras especiales, asciende a $4,536.00.

(b) El valor razonable de las tres enfermeras diarias a razón de $44.00 diarios asciende a $7,084.00.

(c) El valor razonable de los servicios médicos incurridos por dicho demandante, incluyendo las intervenciones quirúrgicas asciende a $2,500.00.

(d) Por pérdida de ingresos desde [la] fecha del accidente hasta que [el] demandante fue dado de alta definitivamente $3,100.00.

Tomando en consideración los serios daños físicos y angustias y sufrimientos mentales sufridos por el demandante, así como su actual incapacidad fisiológica, el Tribunal estima que una compensación de $40,000.00 es justa y razonable por dichos daños.

Para la fecha del accidente los codemandantes Andrés Masa Torres y Francisca González, padres legítimos de Israel, vivían en compañía de su hijo en Aguas Buenas. Se estipuló por las partes que ellos sufrieron las angustias que normalmente sufren un padre y una madre como resultado de la ocurrencia de un accidente como el del caso de autos, a un hijo de esa edad. El Tribunal fija la compensación que deben recibir dichos codemandantes en la suma de $5,000.00, conjuntamente."

Convenimos con la recurrente en que la prueba estableció que: las facilidades eléctricas de un proyecto de urbanización son construidas por contratistas eléctricos particulares y no por la Autoridad de las Fuentes Fluviales; que los contratistas eléctricos garantizan las facilidades eléctricas por ellos construidas durante un período no menor de un año, desde que las mismas son inspeccionadas y aprobadas por la Autoridad de las Fuentes Fluviales; que cualquier defecto que aparezca en dichas instalaciones durante el citado período, debe ser reparado y corregido por el contratista eléctrico; que las instalaciones eléctricas de proyectos de urbanización son inspeccionadas por la Autoridad, para determinar si las mismas reúnen y cumplen los requisitos técnicos establecidos por dicha Autoridad y el Código

Eléctrico Nacional; que para el día 19 de octubre de 1964, la Autoridad había inspeccionado las instalaciones eléctricas construidas por el contratista eléctrico Carrero & Tristani en el bloque 4V de la Urb. Villa del Rey, incluyendo los solares 1 al 16 de dicho bloque; que se encontró que dichas instalaciones llenaban los requisitos técnicos antes mencionados; que el transformador T-18 que era parte de las instalaciones eléctricas inspeccionadas y aprobadas en la sección cuarta de Villa del Rey, sufrió una avería al ser puesto en operación y con motivo de ello se cambió la cablería de su sistema secundario por obreros de Carrero & Tristani, dejándose de conectar debidamente los cables nuevos que se utilizaron.

Con respecto a cómo ocurrió el accidente el tribunal de instancia tuvo ante sí los testimonios conflictivos del perjudicado Israel Masa González y el de Canetti.

El perjudicado testificó que sólo había trabajado con Carrero & Tristani unos ocho meses como electricista de líneas muertas, es decir, conectaba cables sin corriente en pedestales, *switches* y transformadores; que Canetti lo convidó a conectar unos cables en el transformador T-18 el cual Canetti abrió con una llave del candado que cerraba las dos puertas del aparato; que Canetti no llevaba vareta para sacar los machetes del transformador y así dejarlo sin corriente; que el testigo preparó una vareta a petición de Canetti consistente de una tabla con un clavo; que entonces Canetti sacó los tres machetes del transformador y le ordenó conectar los cables que habían sueltos; que al expresar el perjudicado su temor a la corriente, Canetti le contestó "Olvídate, que no hay corriente"; que "toqué con el alicate de él y no había corriente en ese sitio"; que se "añangotó" para conectar los dos cables. Lo que ocurrió entonces, según el perjudicado, aparece del récord así:

"R. Entonces, empecé a conectar; pegué a conectar los cables, pero, como el rotito del conector era pequeño . . .

P. ¿El rotito de qué?

R. Del conector era pequeño.

P. El rotito del conector era pequeño.

R. Entonces, traté de meterlo, pero, como el cable tiene como seis pelitos, se me encajaba, no entraba bien.

P. Trató de meterlo, pero, como el cable tiene como seis pelitos, se le encajaba y no entraba bien. Y ese cable de seis pelitos, ¿tenía que entrar por ese rotito del conector?

R. Sí, señor.

P. ¿Y era un rotito muy pequeño?

R. Sí, señor.

P. ¿Y qué pasó?

R. Había intentado dos o tres veces meterlo por ahí, pero, estaba medio cansado y moví la rodilla hacia el lado derecho . . .

P. ¿Hacia el lado derecho, o el lado izquierdo?

R. Hacia el lado izquierdo.

P. Por qué?

LCDO. LUGO:

Porque estaba medio cansado, fue la palabra.

R. Sí.

.    .    .    .    .    .    .    .

LCDO. CASTRO FERNÁNDEZ:

P. Estaba incómodo en ese sitio. Y mientras, estaba tratando de meter esos seis pelitos. ¿Dice usted que son seis?

R. No estoy seguro. Tiene, más o menos, seis o siete.

P. ¿Qué ocurrió?

R. Ahí fue que yo cogí el cantazo.

P. ¿Que qué?

R. Con el machete. Moví la rodilla hacia el lado izquierdo y ahí fue que yo cogí el cantazo.

LCDO. LUGO:

P. ¿Dobló la rodilla hacia el lado izquierdo?

R. No, la moví y desde ahí para abajo no sé más nada de eso."

Al ser confrontado con su declaración suscrita en el hospital al día siguiente del día del accidente, contestó en forma evasiva en relación a su firma e iniciales en la misma. Más tarde admitió su abogado que la firma en la declaración

era la del testigo luego de éste conocer su firma en unos interrogatorios.

En contrainterrogatorio, sin embargo, el perjudicado declaró que: había trabajado con Carrero & Tristani anteriormente y no únicamente durante los ocho meses anteriores al accidente; que para llegar a electricista recibió entrenamiento de dicha compañía pero que "sobre corriente no me enseñaron, me enseñaron el trabajo que iba a hacer y cómo tenía que hacerlo"; que su patrono "bregaba" con alambres para ser utilizados en la conducción de electricidad, con transformadores, con pedestales que son sitios "de donde van los cables secundarios y las tomas de las casas" para dar servicio eléctrico a éstas; que él instalaba los pedestales y los alambres del pedestal a las casas y del pedestal a los transformadores y de uno de éstos a otros; que hizo ese trabajo en el transformador T-18 donde había trabajado antes del accidente y donde ocurrió una explosión con motivo de una conexión defectuosa de alambres secundarios. Insistió en que cuando apareció Canetti preguntó si había alguien que conectaba cables y el testigo le informó que el testigo estaba a cargo de conectar cables para Carrero y Tristani; que sabía que había que conectar los cables en el transformador T-18 y que creía que eso era "atributo de Carrero y Tristani" y por eso fue. Dijo conocer lo que eran cables primarios que son unos cables gruesos; que en el transformador tiene dos compartimientos; que el de la izquierda tiene el sistema primario de electricidad y el derecho contiene el secundario de donde van unos alambres a otros pegados a la misma caja y el otro extremo del alambre queda bajo tierra por donde va a los pedestales o transformadores; que los machetes están en el lado izquierdo del transformador, lado separado del otro por "Un pedazo de tabla fino"; que esos machetes se sacan con un gancho y no con la mano porque "Se supone que tenga corriente", corriente que viene por el cable llamado primario que entra

al transformador por debajo; que él había visto abrir un machete en el referido transformador anteriormente con una vareta; que además de la vareta, Canetti se colocó en las manos unos guantes primarios que "Yo los conozco como dos gomas, que viene una parte en cuero y una parte en goma . . . en el mismo guante . . ."; que esos guantes se utilizan para trabajar con corriente; que cuando se abren esos machetes parte de ese transformador se queda sin corriente eléctrica; que utilizó el alicate para probar la corriente eléctrica en el lado derecho del transformador donde iba a trabajar.

El testigo Canetti testificó que fue al proyecto atendiendo una queja de que una casa en la referida sección no recibía corriente. Encontró unos cables secundarios no conectados al transformador T-18. Semanas antes, al darle corriente al bloque en esa sección, hubo una explosión en un pedestal a 50 ó 60 pies del transformador debido a mala instalación de los cables. Tres empleados de Carrero y Tristani lo arreglaron pero dejaron de conectar los cables secundarios al transformador. Fue a buscar al capataz de Carrero y Tristani encargado del trabajo para que hiciese la conexión. No lo encontró pero sí al segundo de Collazo, un señor Díaz, y éste envió a Masa y éste se fue con el testigo y otro en un vehículo de la Autoridad. Al llegar al transformador el testigo sacó un plano, abrió las puertas del aparato y le explicó al perjudicado "lo que había pasado y cómo era que estaban los cables y dónde era que estaban y cuáles eran, abrí el compartimiento izquierdo donde estaba la primaria, saqué los machetes y el fusible para que se quedara la parte derecha que era donde estaban los cables sin conectar muertos." El testigo se puso unos guantes primarios y removió los machetes del lado izquierdo "para que se quedara la parte derecha que era donde estaban los cables sin conectar muertos. . . . Le expliqué al señor Masa que lo único que él tenía que hacer era conectar los cables que se

le habían quedado a ellos sin conectar, conectarlos. El me dijo que sabía y los fue a conectar. Yo le expliqué al señor Masa que en ambos lados había corriente; que en el lado que él iba a trabajar le íbamos a quitar la corriente para que ese compartimiento de la derecha se quedara sin corriente. Él me dijo que siempre iba a haber corriente. Yo le dije que iba a haber corriente en lo más mínimo, que se iba a quedar la vara y el machete de la izquierda muerto y que el machete de la derecha era el único que se quedaba con corriente. Recuerdo que él me dijo primero que se iban a quedar bastantes partes con corriente. Eso lo recuerdo, porque entonces yo procedí a quitar los demás machetes, para que una tercera parte sola se quedara con corriente y así eliminábamos las dos terceras partes. Cuando fue a meter el cable, en esos segundos ocurrió una explosión, el señor Masa cayó hacia atrás, cayó hacia el lado mío, había otro empleado de Carrero & Tristani hacia el lado izquierdo, como a siete pies del gabinete, Sierra, y como a veinte pies del gabinete estaba Castro Cabezudo. Entre los tres retiramos al señor Masa del gabinete; Castro Cabezudo le aguantó todo el cuerpo, Sierra le dio respiración artificial y yo fuí corriendo a buscar la guagua que se encontraba como a cuarenta pies del gabinete. La traje, montamos al señor Masa en la guagua; Castro Cabezudo la guió; yo me fuí hacia atrás; montamos al señor Masa en el asiento y fuímos hacia la clínica."

El accidente ocurrió luego de Masa haber conectado bien uno de los cables secundarios y mientras trataba de conectar el segundo. Dijo Canetti que las dos puertas del transformador se quedaron abiertas y estaban abiertas cuando ocurrió el accidente. No cerró una porque el conectar los cables secundarios "Era un trabajo de un segundo. Más se tardaba en cerrar la puerta que en meter el cable." Declaró que él le dijo a Masa "que donde vamos a trabajar no hay corriente en ningún sitio"; que se podía realizar el trabajo con la puerta

izquierda cerrada. Al preguntársele por qué no la cerraron contestó que le preguntaran a Masa; que se pudo desconectar la corriente primaria en otro transformador a unos 400 ó 500 pies de distancia.

El perito del recurrido, Sr. Miguel Ángel Mir, testificó que la corriente en la parte primaria del transformador en cuestión era no menor de 1,200 a 1,400 voltios y de 120 en la secundaria—era peligrosa para la vida humana. Declaró que para evitar el accidente se debieron tomar dos medidas de seguridad—asegurarse que no hubiera energía en el transformador desconectando los machetes en otros transformadores a ambos extremos de aquél en que se iba a trabajar—sólo había que caminar un poco. Añadió, como segunda medida, que "además de usar el instrumento apropiado y los guantes, etc., la otra medida muy importante sería, que cuando se tiene una persona trabajando, mantener el ojo encima, porque se puede zafar alguna herramienta y se puede zafar algo sin que nadie lo esté velando y se asume riesgo."

Aunque en su examen directo infirió que el cuidado e inspección de las líneas ya con corriente hasta la admisión en cada caso corresponde por lógica a la Autoridad porque de hecho le ponen candados y sellos para que nadie interfiera, pero en contrainterrogatorio admitió que de existir una avería en el servicio eléctrico de una urbanización dentro del término que el contratista ha garantizado a éste le incumbe repararla; luego dijo que la responsabilidad de reparar la avería existente en este caso era de la Autoridad porque ya había dado el servicio de corriente y del contratista porque probablemente estuviese dentro de su garantía; que al desconectar la electricidad de un transformador posterior y del otro, el área servida por el transformador en el cual se va a trabajar queda sin servicio por un corto tiempo. Testificó que como la avería en este caso era tan sencilla su arreglo correspondía a la parte que tiene juris-

dicción sobre el sistema que es la Autoridad. Añadió que "Yo me atrevo a asegurar que es más seguro, porque la Autoridad de las Fuentes Fluviales cuenta con todo el equipo y todos los medios y todos los conocimientos que tiene." En cuanto al aviso de corriente que Canetti le dio a Masa antes de éste empezar a trabajar en el transformador expresó el testigo la opinión de que "Se supone que se le advierta que en un sitio no hay corriente, pero, que en el otro hay y se le advierta del voltaje, porque es muy importante si él va a trabajar en la secundaria, decirle por qué no hay corriente y se le dice que aquí en la primaria hay, y ya el pone su subconciencia a trabajar y va a tomar precaución. Pero, no basta con decirle que no hay corriente, porque tendría que cerrarle la tapa; porque puede pasar que esté entretenido y pueda sufrir un accidente. Son en los casos de los mismos ingenieros que conocen y han sufrido accidentes fatales por eso"; que tal sistema, desde el punto de seguridad "Es pobre, sabe." Tan es así que él no trabajaría bajo tales condiciones.

El Sr. Blanco Pi testificó que "está estipulado de que el contratista durante un año desde que se conectan las líneas, durante todo ese año él está en la obligación de reparar cualquier avería que haya ahí, o de lo contrario tiene que pagarle a la Autoridad de las Fuentes Fluviales para que le haga el trabajo. Normalmente el contratista opta por hacer el trabajo, debido a que en la Autoridad, pues le cuesta más caro el trabajo." Declaró no compartir el criterio de Mir que a la Autoridad le correspondía conectar los cables bajo las circunstancias de este caso. A esos efectos dijo que "Bueno, no necesariamente, porque si la Autoridad de las Fuentes Fluviales en cada ocasión, en cada oportunidad en que un contratista hace un trabajo que está mal hecho se lo va a corregir, pues, entonces de hecho sería preferible construir los trabajos desde el inicio, o sea, no es norma . . . . Definitivamente corresponde al contratista y

lo hace él, o paga porque se lo hagan. Eso es definitiva-
mente . . . . Él tiene que solicitarlo. Él tiene que darle una
carta por escrito. Hay un modelo que él tiene que llenar
solicitando ese trabajo particular." Declaró que al estar
desconectados los cables secundarios en cuestión las 15 ó 25
casas servidas por ese pedestal no podían tener corriente
eléctrica. El siguiente interrogatorio de este testigo por el
juez de instancia merece consideración:

"P. ¿Usted cree que las medidas que se tomaron cuando
se abrió esa caja, o ese gabinete, fueron las medidas adecuadas,
o el cuidado adecuado para bregar en ese sitio, o pudieron
tomarse otras medidas?

R. Bueno, pudieron tomarse otras medidas para más segu-
ridad.

P. ¿Usted personalmente trabajaría en un sitio de eso en
esas condiciones?

R. Bueno, de hecho yo superviso personal y en la Autoridad
a diario el personal brega en condiciones casi más peligrosas
que ésa.

P. ¿Y qué hace usted cuando tiene que poner a algún tra-
bajador a trabajar en algún transformador de esos?

R. Yo de hecho creo que en este caso hubo un accidente;
probablemente un resbalón de la persona que estaba trabajando
y parece que el pie se le fue y fue a dar contra el machete.

P. Pero, la pregunta es, ¿qué medidas toma usted cuando
va a trabajar, o va a poner a alguna persona a trabajar en
un transformador como ése?

R. Yo en este caso la medida extrema que hubiera tomado
de seguridad es que hubiera desconectado en el otro lado el cable.

P. Cuando usted dice extrema, ¿eso no es lo que hace usual-
mente, o sea, lo que se hace usualmente?

R. En realidad, para el tipo de trabajo que se iba a hacer
no era necesario desconectar el otro lado, pero, ésa hubiera
sido la medida de seguridad máxima."

Dijo que entre personas como él no es práctica el desconec-
tar la corriente en casos como éste porque "toda compañía
que vende electricidad tiene el problema que tiene que man-
tener el servicio y dar continuidad del servicio, o sea, que

hay que mantener el servicio; entonces, a diario la Autoridad realiza trabajos que llevan sus riesgos. O sea, en el trabajo lo correcto sería quitar la corriente, pero, si usted tiene que dejar una serie de abonados por determinado tiempo sin corriente, pues, trata que esa interrupción se haga lo menos posible y trabajos que en realidad se pueden hacer con una medida de seguridad más grande, pues, no se recurre al extremo de desconectar toda la electricidad por eso."

De lo expuesto concluimos que:

1.—Dicho recurrido había recibido entrenamiento en, y realizaba instalaciones de líneas de electricidad, y montaba pedestales y transformadores los que conocía; estaba familiarizado especialmente con el transformador que motivó el accidente en este caso; sabía que había que conectar los cables en el transformador T-18 y que creía que eso era "atributo de Carrero & Tristani"; por eso fue. Dijo conocer lo que eran cables primarios que son unos cables gruesos; que en el transformador tiene dos compartimientos; que el de la izquierda tiene el sistema primario de electricidad y el derecho tiene el secundario de donde van unos alambres a otros pegados a la misma caja y el otro extremo del alambre queda bajo tierra por donde va a los pedestales o transformadores; que los machetes están en el lado izquierdo del transformador; que cuando se abren esos machetes, parte de ese transformador se queda sin corriente eléctrica.

2.—Aunque la máxima precaución consistía en cortar la corriente primaria en el transformador en cuestión, desconectando machetes en otros transformadores cercanos interrumpiendo así el servicio a un crecido número de casas, lo cierto es que era suficiente en este caso el haber mantenido cerrada la puerta izquierda del transformador para así evitar todo contacto con el machete de la corriente primaria que no fue desconectada.

3.—En casos en que ocurre una avería en una instalación eléctrica de una urbanización dentro del término garantizado por el contratista, de éste es la responsabilidad de corregirla. A esos efectos, sin embargo, corresponde a la Autoridad hacer disponible las facilidades—abrir el transformador en este caso—donde se debe realizar el trabajo de reparación. La obligación de dejar sin corriente el área de trabajo corresponde a la Autoridad pero para evitar causar dilaciones innecesarias a muchos abonados del servicio, la Autoridad y el contratista deben ponerse de acuerdo en cuanto al sitio, hora y extensión de la interrupción del servicio y a ambos les corresponde velar porque se tomen todas aquellas precauciones—el cierre de la puerta de la parte derecha del transformador en este caso—que puedan evitar que alguien pueda lesionarse en el curso de la realización de la reparación. Cf. *Vda. de Dávila* v. *Fuentes Fluviales*, 90 D.P.R. 321, 327 (1964) ; *Rosario Crespo* v. *A.F.F.*, 94 D.P.R. 834 (1967).

4.—Al recurrido debe atribuírsele conocimiento de la anterior precaución ya que sabía que allí todavía había corriente peligrosa. Éste se limitó a asegurarse con un alicate que no la había en la parte derecha del transformador a donde iba a trabajar en un trabajo que le correspondía realizar al contratista y no a la Autoridad.

5.—Aunque el recurrido, al tratar de realizar el trabajo de conectar de nuevo los alambres secundarios sueltos al transformador en cuestión no era un empleado de la Autoridad ni actuaba en beneficio de ésta y sí actuaba por cuenta de su patrono Carrero & Tristani, y por lo tanto no le beneficiaban directamente las reglas de seguridad de la Autoridad, no es menos cierto que ésta fue negligente al no cerciorarse de que el recurrido estaba debidamente calificado para ese trabajo y al no tomar las precauciones necesarias para evitar que el recurrido pudiese venir en contacto con el cable primario del transformador como ocurrió, máxime

cuando luego de abrir el transformador, su empleado Canetti dio instrucciones al recurrido sobre el trabajo a realizar y le informó de, y aquél vio, los machetes que desconectó; pero Canetti no cerró la pequeña puerta a la izquierda que hubiera evitado todo contacto del recurrido con el cable primario que no fue desconectado. *Vda. de Dávila,* supra, *Rosario Crespo,* supra.

6.—Canetti admitió haberle dicho al recurrido, luego de abrir las puertecillas del transformador y de abrir los machetes por virtud de lo cual se quedó sin corriente la parte del transformador donde iba a trabajar el recurrido, que "No hay corriente en ningún sitio." Aunque éste conocía el transformador, los tipos de corriente en el mismo, y que luego de abrirse los machetes sólo parte del transformador se quedaba sin corriente, no es menos cierto que sólo había trabajado en la instalación de sistemas eléctricos sin corriente. De manera que tal aseveración pudo inducir al recurrido a estar menos consciente del hecho conocido por él de que la parte izquierda del transformador quedaba con corriente y de la necesidad de aislarse de la misma mediante la simple precaución de cerrar la puertecilla de ese lado del transformador.

El tribunal de instancia concedió, entre otros daños recobrables, "El valor razonable de las tres enfermeras diarias a razón de $44 diarios", o sea, la suma de $7,084, más "los servicios médicos incurridos por dicho demandante incluyendo las intervenciones quirúrgicas", o sea, la suma de $2,500.

La prueba aducida con respecto a estos daños consistió del testimonio de un médico al efecto de que "Tuvo enfermeras de tres turnos hasta el 11 de mayo de 1965 que se descontinuó con las enfermeras especiales con turnos de tres a once y de once a siete . . . . Entonces tuvo de siete a tres, enfermeras especiales hasta que se dio de alta." Preguntado sobre el valor razonable de estos servicios y si tales servi-

cios eran indispensables, contestó que "Bueno a las enfermeras especiales se les paga me parece que es catorce dólares los turnos de día y $16 dólares en el turno de la noche, que serían cuarenticuatro diarios . . . . . Obviamente era indispensable porque esas enfermeras las pagaba el Fondo."

Con respecto al valor de los servicios médicos prestados, testificó el referido testigo médico que "Ésa es una pregunta un poco difícil de contestar, licenciado, porque yo nunca he estado en posición de cobrarle a un paciente privado esto pero, me imagino que sería de dos mil a tres mil dólares."

■ En repetidas ocasiones hemos dicho que la cuantía de daños realmente sufridos como los previamente relacionados, debe probarse con razonable certeza y precisión, sin recurrir a especulaciones. *Rodríguez* v. *Serra*, 90 D.P.R. 776, 779 (1964); *Seda* v. *Miranda Hnos. & Co.*, 88 D.P.R. 355, 362, 363 (1963); *Rivera* v. *Martínez*, 26 D.P.R. 760, 764 (1918); *González* v. *San Juan L. & T. Co.*, 17 D.P.R. 124, 129 (1911).

■ A nuestro juicio, no se estableció la necesidad de las referidas enfermeras pues el hecho de que las pagase el Fondo del Seguro del Estado no constituía la prueba razonablemente precisa de su necesidad. La prueba del valor de los servicios médicos es especulativa ya que consiste en la apreciación de dicho valor por una persona sin la necesaria experiencia para hacerla.

Por considerar que la cuantía concedida por concepto de honorarios de abogado es excesiva, la misma debe reducirse a la suma de $2,000 que es la razonable bajo las circunstancias de este caso.

En vista de lo expuesto, concluimos que el accidente que motivó las serias lesiones sufridas por el recurrido se debió, en un 66-2/3% a la negligencia de la recurrente, y en un 33-1/3% a la propia negligencia del recurrido.

■ *Por lo tanto, debe modificarse la sentencia dictada en este caso por el tribunal de instancia a fin de (1) eliminar la ·concesión de $9,584 por concepto de servicios médicos y de enfermeras; (2) reducir la cuantía concedida por concepto de honorarios de abogado a la suma de $2,000; y (3) reducir en una tercera parte la cuantía de los demás daños impuesta a la recurrente en favor del recurrido y de su padre. Así modificada debe confirmarse.* (¹)

(¹) La Asamblea Legislativa debe considerar la conveniencia de aprobar legislación autorizando a los tribunales a dictar pronunciamientos para resarcir a instituciones públicas de beneficencia, y al Fondo del Seguro del Estado en adición de lo provisto en el Art. 31 de la Ley de Compensaciones por Accidentes (11 L.P.R.A. sec. 32), de los gastos en que incurran en el tratamiento de lesionados, incluyendo honorarios por servicios médicos, independientemente de que figuren como parte en el pleito.