| Ricardo Nazario Acosta, et al. Demandantes-Peticionarios v. Estado Libre Asociado de Puerto Rico, et al. Demandados-Recurridos | Certiorari 2003 TSPR 116 159 DPR _____ |
|---|---|

Número del Caso: CC-1998-1033

Fecha: 30 de junio de 2003

Tribunal de Circuito de Apelaciones:
          Circuito Regional V

Juez Ponente:
          Hon. Ramón Negrón Soto

Abogado de la Parte Peticionaria:
          Lcdo. Juan R. Rodríguez

Oficina del Procurador General:
          Lcda. Vannessa Ramírez
          Procuradora General Auxiliar

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ricardo Nazario Acosta,
et al.

  Demandantes- Peticionarios

  v.                        CC-1998-1033   Certiorari

Estado Libre Asociado de
Puerto Rico, et al

  Demandados-Recurridos

SENTENCIA

San Juan, Puerto Rico a 30 de junio de 2003.

En el presente recurso nos corresponde dilucidar si prescribió la demandada incoada por un ex miembro de la Policía contra el Estado Libre Asociado de Puerto Rico por despido injustificado y por su negligencia al investigar, por tiempo indefinido, unas alegadas irregularidades cometidas por él mientras dirigía una división de la uniformada. Por entender que algunos de los daños sufridos como consecuencia de las actuaciones del Estado no han prescritos, confirmamos al Tribunal de Circuito de Apelaciones.

I

En 1981, Ricardo Nazario Acosta (en adelante Nazario Acosta) fue nombrado director de la División de Drogas y Narcóticos de Ponce. Posteriormente el señor Juan A. González Hernández (en adelante, el agente González) fue asignado como agente encubierto a dicha División. Ese mismo año, Nazario Acosta, en el desempeño de sus funciones directivas, comenzó una investigación en contra del agente González por alegadas irregularidades cometidas por éste.

Poco tiempo después de comenzada la investigación antes mencionada, el agente González alegó ser agredido por narcotraficantes, versión que luego alteró señalando a agentes de la División como los presuntos agresores como parte de una conspiración para matarlo. Dichas expresiones fueron publicadas en varios periódicos del país[1].

Los reportajes publicados provocaron el inicio de una investigación en contra de Nazario Acosta y el traslado de éste, en el 1984, al Negociado de Asunto Criminales en San Juan, relevándolo de su puesto como Director de la División. Inconforme con el traslado, Nazario Acosta solicitó reconsideración de la decisión, la cual fue denegada. Dicha determinación no fue apelada ante la Junta de Apelaciones del Sistema de Administración de Personal

---

[1] El Vocero publicó noticias sobre las imputaciones hechas a Nazario Acosta en sus ediciones del 16, 17, 19, 21, de noviembre de 1984; 6 de diciembre de 1984; 28 de febrero de 1987 y; 2 de octubre de 1987. El Mundo publicó una noticia sobre estos hechos el 17 de noviembre de 1984. El Nuevo Día publicó noticias, relacionadas a los mismos hechos, el 21 y 22 de noviembre de 1984.

(en adelante J.A.S.A.P.)  Consecuentemente, se le informó que su traslado era permanente.

En mayo de 1985, Nazario Acosta presentó su renuncia a la Policía por haber sido relevado de sus funciones y sometido a una investigación administrativa.  No obstante como había una investigación pendiente, su renuncia no fue aceptada.  En octubre de 1986, más de un año después de su renuncia, y en vista de que ésta nunca había sido aceptada, Nazario Acosta solicitó el retiro de la misma y consecuentemente, su reingreso a la Policía.  Esta petición no fue contestada, a pesar de haberse solicitado en varias ocasiones una determinación en cuanto a la misma.  A petición de Nazario Acosta, en julio de 1989, la División de Nombramientos y Cambios de la Policía emitió una Certificación en la cual se indicó que la renuncia todavía no había sido aceptada "por tener una investigación pendiente en la Oficina de Asuntos Legales".  De hecho, la Policía nunca concluyó la investigación iniciada en contra de Nazario Acosta.  Tampoco se sometieron cargos en su contra ni se le contestaron sus requerimientos sobre el estado de la misma.  La Policía sí solicitó una prórroga para poder concluir la investigación y someter cargos la cual fue concedida por la Comisión de Investigación, Procesamiento y Apelación (en adelante C.I.P.A.).  Dicha prórroga le extendió el término para concluir la susodicha investigación hasta el 21 de febrero de 1985.

En 1984, Nazario Acosta solicitó admisión a la Escuela de Derecho de la Pontificia Universidad Católica de Puerto Rico.  Sin embargo, el 21 de noviembre de ese mismo año, fue informado que su solicitud no podía ser considerada hasta tanto terminara dicha investigación.  En mayo de 1985, éste solicitó una licencia para tener y poseer arma de fuego, a lo que la Policía presentó objeción debido a la investigación mencionada. En consecuencia, dicha licencia fue denegada.  En una segunda ocasión, cuando solicitó la licencia de portación de arma de fuego, fue el Departamento de Justicia el que objetó por el mismo fundamento.  No obstante, Nazario Acosta impugnó estas determinaciones ante el Tribunal de Primera Instancia logrando que ambas licencias fueran otorgadas.

En 1989, mientras todavía desconocía los resultados de la investigación y de la renuncia sometida, Nazario Acosta solicitó la liquidación de ahorros y dividendos de la Asociación de Empleados del E.L.A., el importe del dinero correspondiente al Fondo de Retiro de los Empleados del Gobierno y el correspondiente a las vacaciones acumuladas. Esta petición fue denegada, por el fundamento de que aún estaba pendiente la susodicha investigación.  Ese mismo año también solicitó una licencia de detective privado la cual fue denegada, por idéntico fundamento.  Eventualmente la misma fue concedida en febrero de 1993.

El 15 de diciembre de 1988, Nazario Acosta, su esposa y la sociedad de bienes gananciales[2] compuesta por ambos, demandaron al Estado Libre Asociado de Puerto Rico, entre otros[3], solicitando daños sufridos como consecuencia de haber sido discriminado ilegalmente por razones políticas. Alegó además que la Policía fue negligente al mantener una investigación en su contra de forma indefinida la cual tuvo como consecuencia la denegación de una serie de solicitudes y, que el comportamiento de esta agencia fue contrario al Reglamento de la Policía, la Ley de Personal, la Ley de Derechos Civiles Federal y las Constituciones de Puerto Rico y de los Estados Unidos.  En la demanda sostuvo que la actuación negligente del Estado al mantener inconclusa una investigación en su contra, le ha ocasionado daños a su reputación y a su vida personal además de sufrimientos y angustias mentales. Alegó además que se le privó de su derecho a reingresar a la Policía y disfrutar de todos los derechos y beneficios marginales y económicos, acumulados luego de dieciséis años de Servicio Público. De igual forma, alegó que su esposa sufrió angustias y sufrimientos

---

[2] Los codemandantes Ricardo Nazario Acosta e Irene Pomales Franco estuvieron casados desde el 22 de noviembre de 1985 hasta el 28 de marzo de 1989.  El 26 de mayo de 1990, Ricardo Nazario Acosta se casó con Lilliam J. Hernández Meléndez y, a estos efectos, la demanda fue enmendada para incluir a la Sra. Hernández y a la sociedad de ganaciales Nazario Acosta-Hernández Meléndez.

[3] Incluyeron a las tres personas que habían ocupado el puesto de Superintendente de la Policía hasta la fecha de la presentación de la demanda tanto en su carácter personal como oficial. También se demandó al agente Juan A. González Hernández de quien los demandantes posteriormente desistieron sin perjuicio.

al ver a su esposo desprovisto de su empleo y humillado ante su comunidad. Finalmente expuso que la sociedad de gananciales sufrió daños por los sueldos dejados de percibir por Nazario Acosta a consecuencia del discrimen ilegal del cual fue objeto el cual culminó con su salida de la Policía.

El E.L.A., por su parte, replicó que la acción estaba prescrita, razón por la cual solicitó la desestimación de la demanda. Luego de varios incidentes procesales el Tribunal de Primera Instancia dictó sentencia a favor de Nazario Acosta por entender que éste había sido víctima de discrimen político que lo forzó a presentar su renuncia, lo que constituye un despido constructivo. Dicho foro ordenó el pago de una suma en concepto de daños, las sumas acumuladas por concepto de licencia de vacaciones y de enfermedad, las aportaciones al Retiro, la mesada y el salario dejado de percibir.

Por no estar de acuerdo con dicho dictamen el E.L.A. acudió al Tribunal de Circuito de Apelaciones quién revocó la sentencia apelada por entender que la acción por discrimen político estaba prescrita revocando, de este modo, la concesión de daños por motivo de discrimen político, los salarios dejados de percibir y la mesada. También dejó sin efecto la concesión de daños causados como consecuencia de la negligencia por parte del Estado al no archivar la investigación en contra de Nazario Acosta. Sin embargo, le ordenó al E.L.A. el pago en concepto de

licencia de vacaciones y enfermedad acumuladas, la devolución de las aportaciones al Retiro y a las cuotas a la Asociación de Empleados del E.L.A. Por último, devolvió el recurso al foro de instancia para que se determinaran aquellos daños sufridos por los demandantes, al amparo del Art. 1802, que no habían prescritos, y fuesen producto de la investigación administrativa de la cual fue objeto Nazario Acosta.

Inconforme, Nazario Acosta acude ante nos alegando que incidió el Tribunal de Circuito de Apelaciones al determinar que la acción por discrimen político y la acción por despido ilegal estaban prescritas y, consecuentemente, revocar la partida de daños concedida por el Tribunal de Primera Instancia en concepto de mesada y salario dejado de percibir. Luego de expedir el auto solicitado y examinar las comparecencias de las partes, resolvemos.

II

En síntesis, la controversia del caso de autos se circunscribe a determinar si las acciones por discrimen por razones políticas y despido ilegal están prescritas. Debemos examinar además si la reclamación de daños ocasionados por la negligencia del Estado al mantener inconclusa una investigación administrativa también está prescrita.

La prescripción es una institución de derecho sustantivo, regulada por el Código Civil, que constituye una forma de extinción de un derecho debido a la inercia en

ejercer el mismo durante un término determinado. Santiago Rivera v. Ríos Alonso, res. el 7 de febrero de 2002, 2002 T.S.P.R. 15, Galib Frangie v. El Vocero, 138 DPR 560, (1995). La misma castiga la inercia en el ejercicio de los derechos y, a la misma vez, evita los litigios difíciles de adjudicar por la antigüedad de las reclamaciones, hecho que podría dejar a una de las partes en estado de indefensión. Culebra Enterprises Corp. v. E.L.A., 127 D.P.R. 943, (1991); Cintrón v. ELA, 127 D.P.R. 582, (1990).

El Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, provee una causa de acción a favor de toda persona que sufra daño por la culpa o negligencia de otro. Por su parte, el Art. 1858 del Código Civil, 31 L.P.R.A. sec. 5298, dispone que las acciones para exigir responsabilidad por culpa o negligencia, al amparo del Art. 1802, *supra*, tienen un término prescriptivo de un año. El periodo prescriptivo de esta acción comienza a transcurrir desde el momento en que el agraviado tiene conocimiento del daño sufrido y de quien es el autor del mismo, ya que es en este momento en que conoce los elementos necesarios para poder ejercitar efectivamente su causa de acción. Cualquier disposición que exija a los demandantes instar su causa de acción antes de que éstos advengan en conocimiento de que tal acción les asiste, viola su debido proceso de ley. Alicea v. Córdova, 117 DPR 676, (1986).

Cuando nos encontramos ante una reclamación de este tipo y debemos determinar si dicho término ha transcurrido,

uno de los aspectos que debemos analizar es el tipo de daño ocasionado. El inicio del término prescriptivo con el cual cuenta el perjudicado para vindicar su derecho varía dependiendo de si ha sido víctima de un daño continuado o si, por el contrario, ha sufrido daños sucesivos a consecuencia de la actuación del demandado.

Ya anteriormente habíamos definido a los daños continuados como "aquéllos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen también que se conozcan, por ser previsible, el carácter continuado e ininterrumpido de sus efectos, convirtiéndose, en ese momento, en un daño cierto compuesto por elementos de un daño actual (aquel que ya ha acaecido), y de daño futuro previsible y, por tanto, cierto." Santiago Rivera v. Ríos Alonso, *supra*, a la pág. 4; Galib Frangie v. El Vocero, *supra*, a la pág. 575, citando a H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2nda Ed.,Publicaciones J.T.S., San Juan (1986), pág 648. En otras palabras, son aquellos daños producidos por uno o más actos imputables al actor en donde el daño posterior, acaecido como consecuencia del acto culposo o negligente, es previsible por lo que constituye una sola causa de acción. Es, por tanto, determinante para poder clasificar los daños como continuados que los daños futuros sean previsibles.

Lo determinante para establecer el inicio del término prescriptivo, en los daños continuados, es el momento en que comienza la producción del daño. Es a partir de este momento que comienza a transcurrir el término de un año que tiene el perjudicado para hacer valer su derecho, suponiendo, claro está, que éste tiene conocimiento, desde entonces, de quién es la persona responsable de los mismos. Esto debido a que lo característico de los daños continuados es que los mismos son previsibles. Al ser previsibles se entiende que el término prescriptivo comienza a transcurrir cuando el perjudicado conoce, por primera vez, el daño y quién es el responsable del mismo y que dicho daño "comprende todas sus consecuencias como posibles sean de prever. Es decir, que la inseguridad sobre el volumen y la cuantía de los daños no excluyen el comienzo de la prescripción". H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, *supra*, pág 648, citando a J. Santos Briz, La responsabilidad civil: Derecho Sustantivo y Derecho Procesal, 2da Ed., Ed. Montecorvo, Madrid, (1977), pág. 836. Véase, J. Santos Briz, La responsabilidad civil: Derecho Sustantivo y Derecho Procesal, 7ma Ed., Ed. Montecorvo, Madrid, (1993), pág. 1187.

En síntesis, en los daños continuados, precisamente por ser de carácter previsible, el daño cierto incluye todos aquellos daños futuros que se puedan prever. Debido a su previsibilidad, el carácter continuado e

ininterrumpido de sus efectos se convierte en daño cierto que incluye el daño acaecido y el daño futuro previsible. Por ser dichos daños futuros previsibles, ciertos y conocidos, el término prescriptivo para instar la acción para su resarcimiento comienza a transcurrir desde que el agraviado tuvo conocimiento del primer daño cierto y puede predecir la ocurrencia de los daños subsiguientes. H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, *supra*, pág. 643.

En otras palabras, en el caso de los daños continuados, el daño original se conoce en un momento dado y desde ese momento se pueden prever consecuencias lesivas que continuarán ocurriendo en el futuro de forma incesante y sostenidamente a causa de la actuación del demandado. Dicha previsibilidad convierte a dichas consecuencias en un daño cierto coetáneo, o en una ampliación del daño original. H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, *supra*, pág. 647. Y es debido a que dichos daños son previsibles que podemos considerarlos, junto al daño acaecido, en daños ciertos, razón por la cual el término prescriptivo puede comenzar a transcurrir.

De otro modo, tendríamos la situación donde en casos de daños continuados mientras persista el daño el perjudicado puede retrasar el inicio de la acción y cobrar retroactivamente por daños ocurridos años y quien sabe si décadas atrás. Dicho resultado sería contrario al propósito

de los términos precriptivos que precisamente castigan la inercia en el ejercicio de los derechos, y evitan que el poder público proteja por tiempo indefinido los derechos no reclamados por su titular. Culebra Enterprises Corp. v. E.L.A., *supra*. Como es sabido, los estatutos prescriptivos fomentan la estabilidad jurídica y la seguridad en el tráfico jurídico. Los mismos promueven la justicia al evitar la resucitación de causas viejas y las consecuencias inevitables de paso del tiempo. Culebra Enterprises Corp. v. E.L.A., *supra*.

Por otro lado, los daños sucesivos son "una secuencia de reconocimientos de consecuencias lesivas por parte del perjudicado, las que se producen y manifiestan periódicamente, pero que se van conociendo en momentos distintos entre los que media un lapso de tiempo finito, sin que en momento alguno sean previsibles los daños subsiguientes, ni sea posible descubrirlos empleando diligencia razonable." Santiago Rivera v. Ríos Alonso, *supra,* a la pág. 4, citando a H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, *supra,* pág. 643. *Énfasis nuestro.* Es decir, son aquellos daños que se repiten sin que sea necesario que los mismos sean iguales en magnitud y cuya sucesión no es previsible. Por no ser previsibles, a diferencia de los daños continuados, no podemos incluir como daño cierto, tanto al daño acaecido como a todos los posibles daños futuros que podrían acaecer. Consecuentemente, en vez de tanto el daño acaecido

como los daños futuros formar una sola causa de acción con un sólo término prescriptivo que comienza a transcurrir tan pronto se tiene conocimiento del daño acaecido, cada daño constituye una causa de acción distinta, y cada una contiene un término prescriptivo distinto, el cual comienza en momentos distintos a partir del reconocimiento del perjudicado de cada daño individual y de quién fue el autor de los mismos. En síntesis, en el caso de los daños sucesivos, debido a que cada daño constituye una causa de acción independiente por los mismos no ser previsibles, cada una de éstas tiene un término prescriptivo independiente cuyo inicio depende del momento en que el perjudicado sufrió cada uno de los daños.

Como es sabido, cuando la ley no especifica un término prescriptivo para una acción civil, debe utilizarse el término de una acción análoga. Siguiendo este principio del derecho, nuestra jurisprudencia ha establecido que el término prescriptivo aplicable a las acciones civiles en daños y perjuicios que surgen al amparo de la Ley de Derechos Civiles es de un año. Olmo v. Young & Rubicam of P.R.,Inc., 110 D.P.R. 740, 742 (1981).

Entre las distintas acciones que están amparadas por esta ley se encuentra aquélla donde una persona es discriminada ilegalmente por parte del Estado. Por lo tanto, la causa de acción que surge como consecuencia de un acto de discrimen ilegal, tienen un término prescriptivo de un año. Delgado Rodríguez v. Nazario Ferrer, 121 D.P.R.

347, (1988)   En tales casos, el término prescriptivo comienza a transcurrir a partir de la notificación de la acción arbitraria o ilegal.   Este término aplica cuando un empleado público es objeto de una acción discriminatoria, arbitraria e ilegal la cual podría ser, pero no se limita a, un despido, incluyendo un traslado o reclasificación entre otras. Cintrón v. ELA, *supra*.

En aquellas ocasiones en las cuales el discrimen ocasione un despido ilegal, el término prescriptivo comienza a transcurrir a partir del momento en que el empleado es notificado de la cesantía.   Delgado Rodríguez v. Nazario Ferrer, *supra*.   Ello es así debido a que es a partir de este momento que el agraviado adviene en conocimiento de los daños que le ocasionó la actuación arbitraria. Ríos Quiñónes v. Administración de Servicios Agrícolas, 140 D.P.R. 868, a la pág 872, (1996).   De igual forma ocurre cuando estamos ante un traslado.   En este caso, el término comienza a transcurrir desde el momento en que se le notifica al perjudicado que la decisión, decretando el traslado, es final.   Dicho término no queda interrumpido por un recurso de revisión ante J.A.S.A.P., debido a que el perjudicado tiene conocimiento del daño desde que se le notifica el traslado. Cintrón v. E.L.A., *supra*; Delgado Rodríguez v. Nazario Ferrer, *supra*.

El término es igualmente aplicable a una causa de acción por despido constructivo.   Existe un despido constructivo cuando un empleado se ve forzado a presentar

su renuncia debido a las condiciones de trabajo onerosas impuestas por el patrono. En otras palabras, estamos ante un despido constructivo cuando los actos voluntarios e injustificados de un patrono tienen el propósito de obligar a un empleado a dejar su cargo siendo ésta la única alternativa razonable que le queda al empleado. Hernández v. Trans Oceanic Life Insurance, res. el 30 de junio de 2000, 2000 T.S.P.R. 115; Vélez de Reilova v. Ramírez Palmer Bros. Inc., 94 D.P.R. 175, a la pág. 178, (1967). En los casos de despido constructivo, el empleado tiene conocimiento del daño al momento de notificar su renuncia por lo que es a partir de ese momento, y no desde que la misma es efectiva, que comienza a decursar el término prescriptivo.

A la luz de esta normativa, pasemos a discutir la situación que tenemos ante nos.

III

La causa de acción por los daños ocasionados por actuaciones discriminatorias por motivos políticos, por las actuaciones negligentes o por despido ilegal tienen un término prescriptivo de un año, el cual comienza a transcurrir a partir del momento en que el perjudicado adviene en conocimiento del daño y de quién es el responsable del mismo. No está en controversia si Nazario Acosta fue discriminado por razones políticas. Lo que nos corresponde resolver es si dicha acción está prescrita.

Según señaláramos, el término prescriptivo de la acción de daños por discrimen político comenzó a transcurrir desde el momento en que Nazario Acosta advino en conocimiento del daño ocasionado por la actuación arbitraria del Estado. En el caso de autos, el término prescriptivo comenzó a transcurrir desde el momento en que el Estado ejecutó la acción arbitraria en contra de Nazario Acosta, a saber, el traslado del cual éste fue objeto. El traslado se notificó el 16 de noviembre de 1984. El 26 de noviembre Nazario Acosta solicitó reconsideración, la cual fue denegada el 15 de abril de 1985.[4]

Como mencionáramos anteriormente, el término para acudir ante el foro judicial comienza a transcurrir a partir de que el agraviado por la actuación discriminatoria es notificado de la misma. En el caso de autos, el término comenzó a transcurrir el 16 de noviembre de 1984. En este momento, la determinación del traslado fue final y es desde esta fecha, cuando Nazario Acosta adviene en conocimiento del daño causado, que comenzó a contar el término prescriptivo de un año para la acción de discrimen ilegal. Al momento en que se insta la demanda, el 15 de diciembre de 1988, ya habían pasado sobre cuatro años desde que Nazario Acosta advino en conocimiento de la actuación

---

[4] Debemos señalar que según nuestro ordenamiento la moción de reconsideración en el foro administrativo tiene que ser resuelta en el término de 15 días luego de ser presentada, de no emitir una determinación se entenderá que la misma fue rechazada de plano. Por tanto, la determinación, emitida el 15 de abril de 1986, denegando la reconsideración fue emitida sin jurisdicción.

discriminatoria y del daño ocasionado por la misma por lo que nos es forzoso concluir que la acción está prescrita.

Por otro lado, Nazario Acosta alega que fue víctima de actuaciones discriminatorias que lo obligaron a renunciar configurándose, de esta forma, un despido constructivo y una causa de acción por despido ilegal. Si en efecto le asiste dicha causa de acción, para determinar si la misma está prescrita debemos analizar el momento en que éste tuvo conocimiento del daño sufrido. Desde ese momento comenzó a transcurrir el término prescriptivo de un año para esta causa de acción.

Nazario Acosta presentó su renuncia el 13 de mayo de 1985 haciéndola efectiva el 31 de mayo de ese mismo año. Independientemente de que la misma fuese efectiva el 31 de mayo o del hecho de que la misma nunca fue aceptada, la realidad sigue siendo la misma. Nazario Acosta, al momento de presentar su renuncia, conocía del daño causado en virtud de la actuación discriminatoria por parte del Estado y estaba en posición de ejercer su causa de acción. Nazario Acosta advino en conocimiento del daño sufrido y de la causa del mismo el día en que notificó su renuncia. Debido a ello, el término prescriptivo comenzó a transcurrir el 13 de mayo de 1985. La demanda se presentó, tres años y siete meses después de haberse notificado la renuncia, o si se quiere, desde el despido constructivo. Esta causa de acción por despido ilegal también está prescrita.

Sin embargo, la causa de acción en virtud de la actuación negligente y discriminatoria por parte del Estado al mantener inconclusa la investigación administrativa en contra de Nazario Acosta, en violación del Reglamento de la Policía[5], y los daños ocasionados por esta negligencia, no están del todo prescritos.  Esto debido a que la negligencia por parte del Estado es la causa de daños sucesivos cuyos términos prescriptivos comienzan a transcurrir en momentos distintos.

Esta investigación, la cual debió concluir en 1985 cuando se expiró la prórroga concedida por la C.I.P.A.,[6] fue la causa de una serie de daños los cuales no hubiesen podido ser previstos por el más diligente de los hombres prudentes y razonables. Esto implica que los daños causados por la susodicha investigación constituyen una serie de daños sucesivos con términos prescriptivos independientes.

La investigación comenzó en noviembre de 1984, se mantuvo abierta indefinidamente luego de transcurrida la prórroga dada por la C.I.P.A. la cual venció el 21 de

---

[5] *Véase* Reglamentos de Puerto Rico, Policía de Puerto, 25 L.P.R.A. sec 1602 (C )(2)(c). Dicha disposición exige que la misma sea realizada dentro de un tiempo razonable.

[6] Debemos señalar que no sólo se mantuvo abierta luego de haber concluido el término otorgado por la C.I.P.A. para radicar cargos o en su defecto desistir de la misma, sino que desde mayo de 1985 la Policía tuvo conocimiento de que el agente González, había sido diagnosticado con esquizofrenia por el Fondo de Seguro del Estado. Este conocimiento, sin más, era razón suficiente para desistir de una investigación que se había iniciado como consecuencia de las imputaciones hechas por el agente y publicadas en los medios. Ello debido a que las mismas son un reflejo de delirios de persecución, uno de los síntomas más conocidos de la condición diagnosticada.

febrero de 1985. Hasta este momento el Estado estaba en pleno derecho de investigar a uno de sus empleados. Una vez pasa el término dispuesto para concluir la investigación y la subsiguiente radicación de cargos, el Estado tenía dos opciones; o presentaba cargos para que de esta forma el empleado tuviese la oportunidad de ser oído, garantizándole su debido proceso de ley o, por el contrario, daba por terminada la investigación. El Estado fue negligente al no actuar en una de las dos formas antes descritas. Es entonces a partir de este momento, el 21 de febrero de 1985, que comienza la negligencia por parte del Estado al mantener la investigación abierta, sin justificación alguna y de forma contraria a derecho. Su negligencia desencadenó una serie de eventos causándole daños a Nazario Acosta que, por la imprevisibilidad de los mismos, constituyen daños sucesivos por lo que tienen términos prescriptivos distintos y, consecuentemente, deben ser analizados individualmente.

Bajo este razonamiento, es forzoso concluir que todas aquellas circunstancias en las cuales la investigación administrativa tuvo efecto negativo para el demandante pero que sucedieron durante el término en que la Policía tenía abierta la investigación legítimamente no le proveen una causa de acción al demandante ya que, en esos momentos, el tener la investigación abierta no constituyó una actuación negligente por parte del Estado. Entre éstas se encuentran

la denegatoria enviada, por la Escuela de Derecho, el 21 de noviembre de 1984.

Por otro lado, tenemos aquellas situaciones en las cuales la investigación administrativa tuvo efectos negativos para el demandante, y ya en ese momento constituía negligencia del Estado mantener la investigación abierta pues habían transcurrido los términos para la radicación de cargos o en su defecto la clausura de la investigación. Cada uno de estos daños constituye una causa de acción diferente, con un término prescriptivo distinto.

En primer lugar, nos encontramos ante la denegación de licencia de tener y poseer arma de fuego. Esta licencia fue denegada el 5 de abril de 1986. Es en esa fecha que Nazario Acosta se entera de la denegatoria, el daño sufrido y que la causa del mismo fue la investigación que la Policía mantenía inconclusa, siendo ésta la responsable del daño. Por consiguiente, es en este momento en que comenzó a transcurrir el término prescriptivo. Al momento de instar la acción, el 15 de diciembre de 1988, habían pasado dos años y ocho meses, desde el inicio del término. Nos es forzoso concluir que la acción en daños como consecuencia de la denegatoria de la licencia de tener y poseer un arma de fuego está prescrita. De igual forma, está prescrita la acción en daños a consecuencia de la denegatoria de la licencia de portación de armas.

En cambio la denegación de la Licencia de Detective Privado, fue notificada el 23 de abril de 1992.

Evidentemente, la causa de acción por los daños ocasionados por esta denegatoria no está prescrita. Aunque la licencia fue eventualmente concedida, el Tribunal de Primera Instancia debe determinar los daños sufridos a consecuencia de la denegatoria, la cual, al igual que las anteriores, se fundamentó en la investigación que pendía en contra de Nazario Acosta.

Nazario Acosta tiene también una causa de acción a su favor, la cual no está prescrita, por los daños ocasionados por la denegatoria notificada el 28 de septiembre de 1989 de su solicitud para liquidar los ahorros y dividendos de la Asociación de Empleados del ELA, el importe del Fondo de Retiro, y el correspondiente a las vacaciones acumuladas. Por años la Policía le impidió a las agencias encargadas de administrar estos fondos que se los reembolsaran. La conducta de la Policía de mantener la investigación eternamente abierta impidió que se le devolvieran unos fondos, a los que tenía derecho, y se le pagaran las vacaciones que tenía acumuladas. No fue hasta el día del juicio, en 1996, que los demandados aceptaron compensar la cantidad adeudada en cuanto a esta solicitud. El Tribunal de Primera Instancia deberá determinar los daños ocasionados por la actuación negligente del Estado que provocó la dilación de este pago.

En el caso de autos, la Policía, al mantener la investigación inconclusa y divulgar constantemente que existía un proceso de investigación administrativa en

contra de Nazario Acosta, interfirió con distintos aspectos de su vida. La actuación negligente del Estado al mantener la investigación en contra de Nazario Acosta inconclusa, le ocasionó daños a su reputación y a su vida personal además de sufrimientos y angustias mentales. Se le ha privado, además, de su derecho a reingresar a la Policía y disfrutar de todos los beneficios marginales y económicos acompañados a sus privilegios y derechos acumulados luego de dieciséis años de servicio. De igual forma, su esposa sufrió angustias y sufrimientos como consecuencias de la situación enfrentada por Nazario Acosta. Todo por una investigación en contra de éste que la Policía mantuvo discriminada e injustificadamente inconclusa por más de doce años.

Debido a que los daños ocasionados por la actuación negligente del Estado son daños sucesivos, por lo que constituyen causas de acción independientes cuyos términos prescriptivos inician en distintos momentos, no todas las causas de acción presentadas por el demandante están prescritas. En vista de ello, se devuelve el caso al Tribunal de Primera Instancia para que haga una determinación sobre la cuantía correspondiente a aquellos daños, sufrimientos y angustias mentales que sufrieron los demandantes como consecuencia de la actuación del Estado al mantener abierta, de forma discriminatoria e ilegal, una investigación en contra de Nazario Acosta. A saber, aquellos causados por la denegatoria de la licencia de detective, impedir su reingreso a la Policía, la negativa

por parte del Estado a liquidar los ahorros y dividendos de la Asociación Empleados E.L.A., el importe del Fondo de Retiro, y el pago de las vacaciones acumuladas. En fin, todos aquellos daños ocasionados por la actuación negligente del Estado al mantener la investigación abierta, que no estuviesen prescritos. Es decir, aquellos ocurridos a partir del 15 de diciembre de 1987, un año antes la interposición de la demanda. El Tribunal de Primera Instancia deberá hacer esa determinación y, en caso de que sea necesario para ello, señalar una vista para oír la prueba y argumentación de las partes.

Por lo antes expuesto, se confirma el dictamen apelativo y se devuelve el recurso al Tribunal de Primera Instancia para que resuelva según lo aquí dispuesto.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Corrada del Río emitió Opinión Disidente a la cual se unió el Juez Asociado señor Rivera Pérez. El Juez Asociado señor Rebollo López no interviene. El Juez Asociado señor Fuster Berlingeri no intervino.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ricardo Nazario Acosta, *et al.*

    Demandantes-Peticionarios

       v.

Estado Libre Asociado de           CC-1998-1033
Puerto Rico, *et al.*

    Demandados-Recurridos

Opinión Disidente emitida por el Juez Asociado señor Corrada del Río a la cual se une el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 30 de junio de 2003.

Una mayoría de este Tribunal entiende que los daños sufridos por el Sr. Ricardo Nazario Acosta, a consecuencia de la investigación ilegal que en su contra llevara el Estado, son de carácter sucesivo, por lo que algunos de estos no son recobrables por razón de prescripción.

Por entender que los referidos daños son de naturaleza continua, disiento de ese aspecto de la Sentencia que suscribe la mayoría.

I

Ricardo Nazario Acosta (en adelante, "el peticionario") trabajó en la Policía de Puerto Rico (en adelante, "la Policía") desde 1968 hasta el 31

de mayo de 1985. Durante ese período, ocupó varios cargos y su labor fue catalogada como excelente. Incluso, recibió varios premios y galardones por sus ejecutorias en el servicio y en el cumplimiento de su deber.

Entre septiembre y octubre de 1978, el peticionario formó parte de la escolta del entonces gobernador, Hon. Carlos Romero Barceló, razón por la cual se le identificó como afiliado al Partido Nuevo Progresista (en adelante, "P.N.P.").

Posteriormente, en agosto de 1981, el peticionario fungió como Director de la División de Drogas y Narcóticos de Ponce (en adelante, "la División"), posición desde la cual dirigió varias investigaciones internas. Entre éstas, el peticionario intervino en una investigación que se llevó contra el señor Carlos J. López Feliciano –miembro activo del Partido Popular Democrático– a quien posteriormente designaron Superintendente de la Policía.[7] Asimismo, en agosto de 1984, promovió una investigación relacionada a la conducta del agente encubierto Juan A. González Hernández, a quien se le imputaba que "fabricaba" casos.

Luego de advenir en conocimiento de la referida investigación, el agente González Hernández alegó que el 11 de septiembre de 1984, fue asaltado y agredido por narcotraficantes. Sin embargo, éste luego cambió su versión de los hechos y adujo que quienes lo agredieron fueron unos

---

[7] Según el peticionario, el señor López Feliciano, una vez designado Superintendente, aprovechó la oportunidad para actuar discriminadamente contra su persona por motivos políticos y personales.

agentes de la División, entonces dirigida por el peticionario. Dicho incidente se publicó en los medios noticiosos del país, lo que provocó que la Policía iniciara una investigación en contra del peticionario.

A raíz de ello, el 16 de noviembre de 1984, el Comandante del Área de Ponce, siguiendo instrucciones del señor Jorge L. Collazo Torres, entonces Superintendente de la Policía, relevó al peticionario de sus funciones y lo trasladó al Negociado de Asuntos Criminales en el Cuartel General de Hato Rey en San Juan, **hasta tanto concluyera la investigación sobre lo publicado en los medios**.[8] Luego del traslado, el peticionario no retuvo ni sus funciones ni su puesto.

El peticionario presentó dos (2) mociones de reconsideración de la referida orden de traslado, las cuales fueron denegadas el 12 de diciembre de 1984 y el 15 de abril de 1985. El Negociado de Servicios de Inspección y Asuntos Disciplinarios explicó que su negativa respondía a que **había comenzado una investigación en contra del peticionario** en relación con la información publicada en los medios.

En el ínterin, el peticionario recibió una carta de la Escuela de Derecho de la Universidad Católica de Puerto Rico, fechada el 21 de noviembre de 1984, mediante la cual

---

[8] Nótese que el traslado se ordenó pocos días después de celebrarse las elecciones generales en Puerto Rico, pero transcurridos dos (2) meses desde el alegado incidente que lo provocó.

le notificaron la suspensión de todo trámite relacionado con su solicitud de admisión **hasta tanto culminara la investigación que la Policía llevaba en su contra**.

Vencido el término original conferido para realizar la susodicha investigación, el 8 de enero de 1985, la Policía solicitó una prórroga ante la Comisión de Investigación, Procesamiento y Apelación (en adelante, "C.I.P.A."). La C.I.P.A. le concedió a la Policía hasta el 21 de febrero de 1985 para concluir la misma. Transcurrido el término de la prórroga, y **en vista de que se mantenía inconclusa la investigación administrativa en su contra**, el peticionario se vio forzado a presentar su renuncia el 13 de mayo de 1985, efectiva el día 31. El peticionario alegó que el motivo de su renuncia fue el haber sido relevado de sus funciones, degradado, marginado y sometido a una investigación administrativa durante nueve (9) meses, **situación de incertidumbre que le afectó su estado emocional y personal**.[9]

En vista de que su renuncia aún no había sido aceptada, a pesar de haber transcurrido más de dos (2) meses desde su efectividad, el 8 de agosto de 1985, el peticionario le solicitó por escrito al entonces Superintendente de la Policía, Lcdo. Andrés García Arache, que aceptara su renuncia. El 28 del mismo mes, éste le informó que la misma había sido referida a la Oficina de Asuntos Legales

---

[9] *Véase* Apéndice, a la pág. 26.

de la Policía.       No obstante, su renuncia **nunca** fue

aceptada.[10]

Así las cosas, el 9 de septiembre de 1985, el peticionario le notificó al Superintendente que se había mudado al estado de Alaska, de donde regresó al año siguiente.

De vuelta en Puerto Rico, el peticionario solicitó una licencia para tener y poseer armas de fuego, la cual fue denegada por el Superintendente el 5 de abril de 1986. Dicho funcionario fundamentó su denegatoria **en la pendencia de la investigación administrativa en contra de aquél**. No obstante, el 6 de octubre de ese mismo año, el Tribunal de Primera Instancia (en adelante, "TPI") le ordenó al Superintendente otorgarle al peticionario la licencia solicitada.  Posteriormente, éste solicitó la expedición de una licencia de portación de armas, la cual también le fue concedida por ese tribunal mediante Resolución de 26 de junio de 1987.[11]

Finalmente, el 15 de octubre de 1986, el peticionario le solicitó formalmente al entonces Superintendente –Carlos López Feliciano– el retiro de su renuncia para reingresar a la Policía, **pero su solicitud tampoco fue contestada**.[12]

---

[10] *Véase* Apéndice, a la pág. 68.

[11] *Id.*

[12] En 1989, con posterioridad a la presentación de la demanda, el peticionario le solicitó a la Policía la expedición de una licencia de detective privado. El 23 de abril de 1992, aproximadamente tres (3) años más tarde y

Así las cosas, el 15 de diciembre de 1988, el peticionario, su esposa Irene Pomales Franco y la sociedad legal de gananciales compuesta por ambos (en adelante "los demandantes") incoaron pleito en daños y perjuicios ante el TPI contra, entre otros, el Estado Libre Asociado de Puerto Rico (Cuerpo de la Policía de Puerto Rico) y varios de sus funcionarios —incluyendo las tres (3) personas que ocuparon el puesto de Superintendente hasta la fecha de la presentación de la demanda— (en adelante, "los demandados").[13] Alegaron que los demandados actuaron ilegal

_____

luego de múltiples gestiones sobre el estado de su solicitud, *le denegaron la misma debido a la referida investigación* y a que el peticionario aún figuraba como miembro activo de la Policía. No obstante, dicha licencia le fue concedida el 4 de febrero de 1993.

Además, en 1989, el peticionario solicitó de la Asociación de Empleados del E.L.A. la liquidación de sus ahorros y dividendos; el dinero perteneciente al Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus instrumentalidades (en adelante "Retiro"); y la liquidación de las licencias de vacaciones y enfermedad acumuladas. El 28 de septiembre de 1989, *dicha entidad le denegó el reembolso solicitado, debido a la susodicha investigación administrativa*. *Véase* Apéndice, a la pág. 68.

[13] Nótese, que los demandantes actuaron correctamente al acudir directamente al foro judicial reclamando daños y perjuicios por violación a sus derechos civiles. La Ley Núm. 5 de 14 de octubre de 1975, conocida como la Ley de Personal del Servicio Público de Puerto Rico (en adelante "Ley de Personal"), 3 L.P.R.A. sec. 1301, no faculta a la Junta de Apelaciones del Sistema de Personal (en adelante

continúa...

[7] ...continuación

"J.A.S.A.P.") a responsabilizar civilmente a las agencias administrativas que violen los derechos estatutarios o constitucionales de empleados públicos. La sección 7.17 de la Ley de Personal, 3 L.P.R.A. sec. 1397, sólo le concede a J.A.S.A.P. la facultad de ordenar la reinstalación y el

e inconstitucionalmente, motivados por el hecho de que el peticionario estaba afiliado al P.N.P.; que éstos se negaron a aceptar su renuncia y el retiro de la misma; que la Policía fue negligente al extender indefinidamente la investigación administrativa en su contra; *que son objeto de persecución e investigación ocasionándoles un daño continuo*; que como resultado de dichos actos se le negó al peticionario el ingreso a instituciones educativas; y que los actos de los demandados infringieron el Reglamento de la Policía, la Ley de Personal, la Ley de Derechos Civiles Federal y las Constituciones de Puerto Rico y Estados Unidos.

El E.L.A. presentó una moción de desestimación alegando que la demanda estaba prescrita, la cual fue denegada por el TPI. Tras la presentación de varios escritos, y escuchada la prueba testifical, dicho foro dictó sentencia estableciendo que el peticionario fue discriminado por razones políticas y obligado a renunciar contra su voluntad. Concluyó, además, que el peticionario permaneció en un "limbo administrativo" durante más de doce (12) años,

---

pago de los haberes dejados de percibir por los empleados públicos.

Además, como excepción a la regla general de que J.A.S.A.P. posee jurisdicción primaria en asuntos relativos al principio de mérito, este Tribunal ha reconocido que ante una violación de derechos civiles de un empleado, éste no tendrá que acudir en primera instancia ante el foro administrativo. *Cintrón v. E.L.A.*, 127 D.P.R. 582, 594-595 (1990); *Delgado Rodríguez v. Nazario De Ferrer*, 121 D.P.R. 347, 356-357 (1988).

lo que le impidió disfrutar de los beneficios e ingresos a los cuales tenía y tiene derecho. Añadió que esta situación le ocasionó al peticionario "daños continuos [sic] y permanentes a su reputación y vida personal"[14] y que los demandados fueron negligentes al extender indefinidamente la investigación administrativa. Como resultado, condenó a los demandados, en su carácter oficial y personal, a pagarle solidariamente a los demandantes la suma de $75,000.00 por los daños sufridos, más las sumas acumuladas por concepto de licencia de vacaciones y enfermedad, aportaciones al Retiro, la mesada y el salario dejado de percibir.

Inconforme, el E.L.A. recurrió ante el Tribunal de Circuito de Apelaciones (en adelante, "TCA"). El TCA revocó la sentencia del TPI por entender que la acción por despido injustificado estaba prescrita, revocando así la concesión de daños por motivo de discrimen político, los salarios dejados de percibir y la mesada. También dejó sin efecto la concesión de daños causados como consecuencia de la negligencia del Estado al no archivar la investigación en contra del peticionario. Sin embargo, le ordenó al E.L.A. el pago en concepto de licencia de vacaciones y enfermedad acumuladas, la devolución de las aportaciones al Retiro y a las cuotas a la Asociación de Empleados del E.L.A. Por último, devolvió el caso al TPI para que se

---

[14] *Véase* Apéndice, a la pág.28.

determinaran aquellos daños sufridos por los demandantes, al amparo del Art. 1802, que no habían prescrito, y que fuesen producto de la investigación administrativa de la cual fue objeto el peticionario.

De ese dictamen, los demandantes recurren ante nos haciendo los siguientes señalamientos, a saber:

1. **Si el Tribunal de Circuito de Apelaciones cometió error al determinar que la causa de accion [sic] presentada por los demandantes-peticionarios está prescrita.**

2. **Si el Tribunal de Circuito de Apelaciones cometió error al revocar la concesión [sic] de daños por razón del discrimen político y la perdida [sic] de ingresos mas [sic] la cantidad concedida por concepto de mesada y el pago del salario dejado de de [sic] recibir por el demandante – peticionario, Ricardo Nazario Acosta."**

Expedimos auto de certiorari mediante Resolución de 26 de febrero de 1999.

II

A.  **Prescripción y la acción torticera**

El propósito de la prescripción de las acciones es fomentar el pronto reclamo de los derechos, así como procurar la tranquilidad del obligado contra la eterna pendencia de una acción civil en su contra. *Cintrón v. E.L.A.*, 127 D.P.R 582, 588 (1990). Del mismo modo, la prescripción es un derecho sustantivo que opera para evitar litigios difíciles de adjudicar por la antigüedad de las reclamaciones. *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943, 950 (1991). ***Sin embargo, hemos reiterado que***

*ninguno de estos intereses es absoluto, debiendo ser aquilatados por los tribunales en su justa proyección*. *Santiago v. Ríos Alonso*, res. el 7 de febrero de 2002, 156 D.P.R. ___(2002), 2002 T.S.P.R. 15, 2002 J.T.S. 21 (énfasis suplido); *Colón Prieto v. Geigel*, 115 D.P.R 232, 243 (1984).

Conforme al artículo 1868 del Código Civil de Puerto Rico, 31 L.P.R.A. § 5298, las acciones para exigir responsabilidad civil extracontractual al amparo del artículo 1802, 31 L.P.R.A.§ 5141, prescriben al año desde que el agraviado conoce de la existencia del daño.[15] *Véase De León Crespo et al. v. Caparra Center*, 147 D.P.R. 797 (1999). En cuanto al momento en que se comienza a computar dicho término, el citado artículo 1868, *supra*, dispone que "el tiempo para la prescripción de toda clase de acciones, cuando no haya disposición especial que otra cosa determine, se contará desde el día en que pudieran ejercitarse." A tenor con este articulado, hemos adoptado en nuestra jurisdicción la teoría cognoscitiva del daño, la

---

[15] Igualmente, en *Olmo v. Young & Rubicam of P.R., Inc.,* 110 D.P.R. 740, 742 (1981), establecimos que las acciones instadas en virtud de la Ley Núm. 100, *supra*, y aquéllas en las que se reclaman daños y perjuicios al amparo de la Ley de Derechos Civiles de Puerto Rico, 1 L.P.R.A. § 13, tienen un término prescriptivo de un (1) año. Resolvimos de ese modo por entender que, al igual que las acciones indemnizatorias de tipo general, las acciones por violación de derechos humanos deben incoarse y dilucidarse con prontitud. Ello debido a que no sólo existe un interés de la parte agraviada, sino que también existe un vital interés público de que este tipo de pleitos se ventilen prontamente, en beneficio del bienestar colectivo.

cual postula que el término prescriptivo comienza a decursar cuando el reclamante tuvo conocimiento del agravio, pues es entonces cuando surte efectos jurídicos, ya que puede alegarse y reclamarse la indemnización correspondiente. *Allende Pérez et al. v. Agustín García et al.*, res. el 28 de abril de 2000, 150 D.P.R. ___ (2000), 2000 T.S.P.R. 66, 2000 J.T.S. 78, p. 1072.

Sin embargo, hemos pautado una trayectoria flexible en cuanto al cómputo de dicho término, reconociendo que éste debe comenzar a contarse (además de cuando se tiene conocimiento del daño) *cuando el reclamante conoce los* <u>*elementos necesarios*</u> *para ejercitar efectivamente su causa de acción*. *Santiago v. Ríos Alonso*, *supra*, a la pág. 8; *Padín Espinosa v. Compañía de Fomento Industrial*, res. el 25 de febrero de 2000, 150 D.P.R. ___ (2000), 2000 T.S.P.R. 32, 2000 J.T.S. 44; *Vega Lozada v. J. Pérez & Cía.*, 135 D.P.R. 746 (1994). Asimismo, hemos establecido que "*la prescripción no es una figura rígida sino que la misma admite ajustes judiciales, según sea requerido por las circunstancias particulares de los casos y la noción de lo que es justo.*" *Santiago v. Ríos Alonso*, *supra*, a la pág. 9; *Maldonado v. Russe*, res. el 8 de febrero de 2001, 153 D.P.R. ___ (2001), 2001 T.S.P.R. 14, 2001 J.T.S. 17; *Padín Espinosa v. Compañía de Fomento Industrial*, *supra*; *Vega Lozada v. J.Pérez & Cía*, *supra*.

Ahora bien, la prescripción toma unos contornos particulares cuando se trata de casos en los cuales se han

causado daños continuados. Por su pertinencia al caso de autos, es menester definir y discutir dicho tipo de daños, así como determinar cómo se afecta el modo en que se computa el término prescriptivo de la acción torticera aplicable.

### B. Término prescriptivo y daños continuados

Al dilucidar el concepto de "daños continuados", hemos adoptado la definición que los identifica como:

> aquellos **producidos por uno o más actos culposos o negligentes imputables al actor**, coetáneos o no, que resultan en consecuencias lesivas **ininterrumpidas**, sostenidas, duraderas sin interrupción, **unidas entre sí**, las cuales al ser conocidas hacen que también se conozca –por ser previsible– el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de **daño actual** (aquel [sic] que ya ha acaecido), y de **daño futuro previsible y por tanto cierto.**" *Santiago v. Ríos Alonso*, *supra*; *Galib Frangie v. El Vocero*, 138 D.P.R. 560 (1995).

Al analizar esta definición, podemos identificar tres elementos prominentes y distintivos de este tipo de daño. Primeramente, que la serie de daños tienen que derivarse de un acto culposo (o varios) imputable(s) a un mismo actor.[16] Este primer elemento coloca dentro del concepto de daños continuados la situación en la que un acto culposo atribuible a cierta persona o entidad es la causa próxima de una serie de daños resultantes. En otras palabras, que los daños en cuestión tienen una causa común.

---

[16] Sobre este aspecto véase *Agosto Ortiz v. Municipio de Río Grande*, 143 D.P.R. 174, 184-185 (1997).

En segundo lugar, además de ser el resultado de una causa común, ***los daños continuados se manifiestan ininterrumpidamente y tienen "unidad entre sí."*** Mientras que el elemento de no-interrupción se explica por si mismo, el requisito de unidad supone inexorablemente que cada daño esté relacionado al otro, no pudiendo ser éstos independientes de cada uno. Según la doctrina, la relación que tiene que existir entre dichos daños es más de ***naturaleza*** que de rasgo, grado o calidad. Por tanto, si una serie de daños se derivan de un mismo acto, tiene que concluirse que están unidos, y se relacionan, por ser la consecuencia de una misma conducta o acto lesivo.

Tercero, el daño continuado supone la existencia de daños "actuales" junto a otros que, aunque aún no se verifican, son "previsibles"; es decir, que todos los daños en cuestión son "ciertos." Al explicar esto, la doctrina expresa que es "cierto" aquél daño "cuya existencia se conoce o es ***razonablemente previsible***, aunque no sea posible fijar con exactitud su extensión, magnitud, y valoración." Herminio Brau de Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S. 1986, Vol. II, Cap. X, a la pág. 642 (énfasis suplido).[17] Por tanto, los daños son ciertos si al conocer

---

[17] El citado tratadista habla de que el daño tenga una existencia real, o al menos, una ***probabilidad suficiente***

continúa...

[11] **...continuación**

***de que exista***. Herminio Brau del Toro, *supra*, a la pág. 642 (énfasis suplido).

la parte afectada la naturaleza de los agravios ya experimentados, y constatar que los mismos tienen un patrón, que éstos están unidos entre sí por ser el resultado de una misma causa, la víctima comprende y puede razonablemente prever que de mantenerse vigente dicha causa, continuará sufriendo daños de la misma naturaleza hasta tanto no cese la misma.[18]

Esta conclusión, basada en la interrelación de los tres elementos discutidos, es consistente con nuestros precedentes. A esos efectos, en *Capella v. Carreras*, 57 D.P.R. 258 (1940), reconocimos que la obstrucción de una vía pública, generada por la construcción de una verja, representaba un daño continuado. Resolvimos así toda vez que "se trata de daños y perjuicios causados por ***actos continuos que están latentes hasta que cesa la causa que los genera***." *Id.*, a la pág. 266 (énfasis suplido).[19]

Asimismo, en *Arcelay v. Sánchez*, 77 D.P.R. 824, 837-838 (1955), al reconocer como continuos aquellos daños generados por los ruidos y pestes que producía una planta pasteurizadora, expresamos que "ese principio [continuidad del daño] no descansa en la naturaleza intrínseca del

---

[18] Por ende, si los daños futuros no son previsibles, éstos pueden ser sucesivos, mas no continuados.

[19] En este caso el Tribunal distingue a *Colls v. Municipio de Lares*, 23 D.P.R. 866 (1916), expresando que "[a]quí los daños reclamados resultaron no sólo de la construcción de la cerca suprimiendo la calle si que [sic] del **mantenimiento** de la cerca que prácticamente arruinó la propiedad de las demandantes. ***Se trata, como dijimos, de una perturbación continuada***" (énfasis suplido).

perjuicio ocasionado por la perturbación, *y sí en el carácter continuo o progresivo de la causa que lo origina, que renueva constantemente la acción dañosa* (énfasis suplido). Empleamos este mismo raciocinio en *Seda v. Miranda Hnos. & Co.*, 88 D.P.R. 355 (1963), cuando reconocimos la naturaleza continua de los daños ocasionados por una fábrica que despedía humos y ruidos.

Del mismo modo, en *Santiago v. Ríos Alonso*, *supra*, concluimos que "una causa de acción fundamentada en unos incidentes repetidos, de maltrato físico y emocional, que provocan alegados daños y perjuicios reclamados constituye una modalidad de daños continuados." Apoyamos lo resuelto bajo el razonamiento de que:

> [e]ste tipo de daños es provocado por una serie de actos cuyo efecto neto es precisamente mantener a la víctima en un círculo vicioso de maltrato. Es por ello que los actos de maltrato físico, emocional y sicológico componen un cuadro de daños que, unidos, van encadenándose para producir el efecto neto del maltrato y así, en dicha circunstancia, el último daño acaecido forma parte de ese ciclo de maltrato y genera la causa de acción por éste y por los actos de maltrato anteriores componentes del referido patrón de violencia. *Santiago v. Ríos Alonso*, *supra*, a la pág. 13.

*Resulta evidente de los casos citados que, al hacer la determinación de daños continuados, nos enfocamos más en la causa de los daños-- y el estado psicológico y anímico que la misma generó sostenidamente a lo largo de su existencia-- que en cada evento dañoso en particular.*

Por otro lado, en cuanto al cómputo del término prescriptivo en casos de daños continuados, hemos apuntado a que la postura más aceptada por la doctrina es aquella que "ha declarado con carácter general que... el plazo de prescripción comienza en el momento de la producción del **resultado definitivo**." *Véase e.g. Sánchez v. A.E.E.*, 142 D.P.R. 880, 921 (1997)[20] (citando a Fernando Reglero Campos,

---

[20] En el citado caso, que atendía una situación de discrimen en el empleo en modalidad de hostigamiento sexual, la Opinión Concurrente emitida por la Juez Asociada señora Naveira de Rodón también reconoció los principios que aquí establecemos, al expresar, a la pág. 913, que:

> [e]n estos casos [patrón de hostigamiento sexual] *la atención principal debe recaer sobre el ambiente que ha producido la conducta y no sobre cada acto por separado*. El término prescriptivo en acciones por la creación de un ambiente hostil de trabajo *debe comenzar a decursar desde que cese dicho ambiente*. Esta norma reconoce que el término prescriptivo por lo creación de un ambiente hostil debe comenzar a decursar cuando se disipan las circunstancias que podrían entorpecer el ejercicio de la acción. La norma tampoco perjudica indebidamente al patrono, puesto que en la medida en que esté presente el ambiente hostil éste tendrá la oportunidad de conocer los hechos y tratar de remediarlos (énfasis suplido).

*Véase además* Carlos Irizarry Yunqué, *Responsabilidad Civil Extracontractual*, 4ta Ed., 2000, a la pág. 730, quien al discutir el caso de *Sánchez v. A.E.E.*, *supra*, expresa que":

> [a] mi juicio se crea un ambiente hostil en el empleo mediante hostigamiento sexual que constituye a su vez un patrón de conducta continua, se crea en el empleado la aprehensión de que en cualquier momento puede ser objeto de

**continúa...**

en M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1994, T. XXV, Vol. 2, págs. 454-464)(énfasis suplido).

Ello nos lleva a cuestionarnos, ¿cuándo se verifica el llamado resultado definitivo? Entendemos que por estar los daños continuados inexorablemente atados a su causa originadora, ***el conocimiento definitivo de los quebrantos ocasionados se verifica el día que cesa la fuente de los mismos, ya que mientras ésta exista, y por ende sean previsibles más daños relacionados a ella, no cabe hablar de "resultado definitivo."*** Vigente aún la causa de los daños, el afectado solo puede conocer los daños ciertos ya verificados, mas no aquellos que, aunque previsibles, no son todavía propiamente evaluables en toda su extensión, magnitud y valoración.[21]

─────────────────────────

[14] **...continuación**

esa conducta ofensiva...No me parece que cada acto de hostigamiento deba considerarse como un acto aislado y que por tanto surja una causa de acción separada con cada acto de hostigamiento.

[21] Esta posición es la predominante en España. A modo de comparación, véase lo expresado por Reglero Campos, citando distintas sentencias del Tribunal Supremo español, a los efectos de que:

no resultando siempre fácil determinar en la práctica cuándo se produce o ha producido ese 'definitivo resultado' que en relación con el concepto de daños continuados ***se nos ofrece como algo vivo, latente y <u>conectado precisamente a la causa originadora</u> y determinante de los mismos, que subsiste y se mantiene hasta su adecuada corrección***...ha de entenderse

Resolvimos de ese modo en *Santiago v. Ríos Alonso*, *supra*, a la pág. 13, opinión en la que concluimos que el cese definitivo de la conducta culposa, generadora de la serie de daños, es el momento en que se comienza a contar el término prescriptivo de la causa de acción. Atemperando el raciocinio a la situación de violencia doméstica que se dilucidaba, expresamos que:

> los actos de maltrato físico, emocional y sicológico componen un cuadro de daños que, unidos, van encadenándose para producir el efecto neto del maltrato y así, en dicha circunstancia, **el último daño acaecido forma parte de ese ciclo de maltrato y genera la causa de acción por éste y por los actos de maltrato anteriores componentes del referido patrón de violencia** (énfasis suplido).

continúa...

---

[15] **...continuación**

que en estos casos el *dies a quo* del plazo de la prescripción no es el de la fecha de la ocurrencia del accidente, sino aquel momento en que se alcanza el conocimiento por modo cierto de los quebrantos definitivamente ocasionados. M. Albaladejo, *supra*, a la pág. 460 (énfasis suplido).

Puig Brutau también discute la teoría del "resultado definitivo," citando sentencias del Tribunal Supremo español que lo definen como **el momento en que se conoce cuantitativamente el resultado total del daño**. *Véase* J. Puig Brutau, *Caducidad, Precripción Extintiva y Usucapión*, 3ra Ed., Barcelona, Bosch, 1996, a la pág. 79 (énfasis suplido). *Véase además Sentencia de 24 de junio de 1993* (Rep. Ar. 5.381); *Sentencia de 24 de mayo de 1993* (Rep.Ar. 3.727); *Sentencia de 27 de junio de 1990* (Rep. Ar. 4.900); *Sentencia de 25 de junio de 1990* (Rep. Ar. 889); *Sentencia de 24 de octubre de 1988* (Rep. Ar. 7.636); *Sentencia de 29 de noviembre de 1982* (Rep. Ar. 6.936).

Esa conclusión también es consistente con lo resuelto en *Capella v. Carreras*, *supra*, ocasión en la que rechazamos un planteamiento de prescripción, por haberse instado la demanda pasado el año del comienzo de la conducta lesiva, "toda vez que en la fecha que se inició el pleito, todavía existía el obstáculo o perturbación que dio lugar a la causa de acción." *Id.*, a la pág. 265.

Por tanto, mientras sean previsibles más daños derivados del acto culposo en cuestión, por no haberse descontinuado aún dicha conducta, no existe resultado definitivo y el término prescriptivo no comienza a transcurrir.

Conforme a este marco jurídico, resolvemos la controversia de autos.

III

La investigación que el Estado condujera en contra del peticionario comenzó en noviembre de 1984. Ésta se mantuvo abierta indefinidamente luego de transcurrida la prórroga otorgada por la C.I.P.A., la cual venció el 21 de febrero de 1985. Entendemos que hasta ese momento el Estado estaba en pleno derecho de investigar al peticionario. Sin embargo, una vez vencido el plazo y la prórroga, el Estado tenía dos cursos a seguir: 1) presentar cargos; o 2) dar por terminada la investigación. Así pues, concluimos que al mantener inconclusa de manera indefinida la referida investigación, más allá de los plazos legalmente conferidos, el Estado incurrió en conducta culposa.

La mayoría reconoce que el mantener inconclusa la investigación representó una instancia de discrimen ilegal.[22] Sin embargo, conceptualiza los daños dimanantes de la misma como sucesivos, por lo que aquellos que ocurrieron antes del año anterior a que el peticionario presentara su demanda están prescritos. Diferimos de esa conclusión.

Nos encontramos ante un caso de daños continuados. Entendemos que la situación de autos no presenta una serie de daños aislados e independientes. Por el contrario, los agravios sufridos por el peticionario están interconectados, teniendo como denominador común la investigación que el Estado mantuvo abierta, de forma *ultra vires*, por alrededor de doce (12) largos años. Las angustias que generó en el peticionario la mera pendencia de una investigación en su contra fueron de carácter ininterrumpido mientras ésta se mantuvo ilegalmente abierta. Su sola existencia indefinida, ya vencidos los términos legalmente conferidos para finiquitarla, provocó en éste inquietud y aprehensión.[23]

---

[22] La mayoría expresa, a la pág. 13 de su ponencia, que "[n]o está en controversia si Nazario Acosta fue discriminado por razones políticas. Lo que nos corresponde resolver es si dicha acción está prescrita."

[23] De hecho, el codemandado Jorge L. Collazo Torres expresó que *"para un policía estar bajo investigación administrativa era un San Benito, o sea, algo sumamenteoneroso contra la persona investigada."* *Véase* Apéndice, a la pág. 67.

Ese continuo desasosiego en ocasiones se combinó con otras consecuencias más tangibles, como lo fueron las situaciones en que el peticionario no pudo tener acceso a servicios, puestos, licencias y derechos para los que cualificaba. La mayoría, por el contrario, consideró únicamente como daños estas instancias en que la conducta culposa del Estado resultó en consecuencias lesivas más particularizables, obviando los daños dimanantes de las angustias mentales **sostenidas** que generó la mera existencia indefinida de la investigación. De este modo, **todos** los daños que generó en el peticionario la investigación indefinida tienen que considerarse como una unidad, ya que la conducta ilegal del Estado fue la causa próxima de ellos. *El resolver que éstos son independientes entre sí es obviar que todos son el resultado de la misma conducta.*

Al igual que una cloaca pestilente, una chimenea que despide gases constante e ininterrumpidamente, y una relación caracterizada por un círculo de abusos y vejámenes, el patrón de discrimen por parte del Estado, proyectado y manifiesto a través de una investigación ilegal de vigencia indefinida, es un daño continuo que se va renovando reiteradamente. Por ende, los daños que genera con su apertura solo pueden conocerse, cualificarse y cuantificarse de manera definitiva al cesar de manera concluyente la misma. Es en ese momento que el reclamante conoce todos los elementos necesarios para llevar adecuadamente su acción, ya que es entonces cuando conoce

el "resultado definitivo" del **proceso** investigativo ilegal al que fue sujeto.

Por consiguiente, el peticionario presentó su demanda a tiempo, toda vez que a la fecha en que tomó dicha acción la Policía aún mantenía vigente su conducta ilegal,[24] por lo que todavía no se podía conocer el "resultado definitivo" de la acción discriminatoria del Estado. Al presentar su demanda, el peticionario solo conocía que sus daños tenían un patrón, y que a base del mismo, podía prever que, de continuar pendiente la investigación, existía una posibilidad razonable de sufrir daños de la misma naturaleza.

El tribunal recurrido aplicó de manera muy restrictiva el término prescriptivo, no reconociendo que los actos ante sí eran de carácter continuado. Al así actuar, obvió que los postulados que regulan a dicha figura no son absolutos, debiendo aplicarse ésta en su justa proyección y en atención a los propósitos que persigue.[25] Como expresáramos

---

[24] De hecho, el Estado mantuvo abierta la investigación hasta mucho después de presentada la demanda, lo que nos parece insólito. Su contumacia provocó angustias e inestabilidad en el peticionario por más de una década, además de que resultó en que la Policía no le concediera a éste la licencia de detective privado, y que la Asociación de Empleados del E.L.A. le denegara el desembolso del dinero perteneciente a las aportaciones al retiro y la liquidación tanto de sus ahorros y dividendos, como de las licencias de vacaciones y enfermedad. *Véase* escolio 4, *supra*.

[25] Si uno de los propósitos de la prescripción es procurar la tranquilidad del obligado ante la eterna pendencia de una acción su contra, *Cintrón v E.L.A.*, *supra*,

en *Santiago v. Ríos Alonso*, *supra*, al hacer un señalamiento a esos mismos efectos:

> el tribunal de instancia le imprimió un criterio extremadamente objetivo al cómputo del término prescriptivo[,] ya que solo consideró la fecha en que, según una deposición, la agraviada alegadamente supo que el demandado le había causado un daño, considerando exclusivamente la fecha de los alegados actos de agresión. Sin embargo, no consideró el patrón de conducta de daño emocional o sicológico alegado en la causa de acción.

En suma, la investigación del Estado, que se mantuvo vigente indefinida e ilegalmente, constituyó una espada de Damocles para el peticionario. En consecuencia, los daños que de ella se derivaron son continuados.

IV

Por los fundamentos que anteceden, concluimos que los daños sufridos por el peticionario son continuados, toda vez que éstos exhibían unidad entre sí en cuanto se derivaban de un acto culposo en común; acto que se sostuvo ininterrumpida e indefinidamente por doce (12) años, produciendo consecuencias lesivas de igual naturaleza. Por tanto, resultaba previsible que mientras no se corrigiera

_____

a la pág. 588, no veo la razón para proteger a los demandados en este caso, ya que si éstos mantuvieron abierta la investigación incluso luego de presentada la demanda del peticionario, se entiende que éstos provocaron su propia inestabilidad al reafirmarse en su conducta ilegal. Del mismo modo, por mantenerse vigente dicha conducta, no existía el riesgo de que se dificultase la adjudicación por la antigüedad de las reclamaciones, como tampoco el de que los obligados advinieran en estado de indefensión. Ciertamente, en la medida en que se mantenía vigente la conducta ilegal, los demandados tenían la oportunidad de conocer los hechos y tratar de remediarlos. *Véase Sánchez v. A.E.E.*, *supra*, a las págs. 913-914.

la causa de los daños, ésta continuaría ocasionándole perjuicios al peticionario.

Asimismo, que mientras existía la posibilidad de daños futuros atribuibles a dicha causa, y los mismos eran previsibles, no cabía hablar de "resultado definitivo," por lo que no comenzó a transcurrir el término prescriptivo de la causa de acción del peticionario.

En atención a ello, modificaría la sentencia del TCA para puntualizar que la causa de acción en daños por la investigación que en contra del peticionario llevara la Policía por doce (12) años, no está prescrita.  Por no ser este el criterio de la mayoría, disiento.


                                        BALTASAR CORRADA DEL RÍO
                                        Juez Asociado